## BAYSIDE ENTERPRISES, INC.

v.

## MAINE AGRICULTURAL BARGAINING BOARD, et al.

Supreme Judicial Court of Maine.

Argued June 13, 1986.
Decided Aug. 15, 1986.

---

Reef & Mooers, P.A., Daniel W. Mooers (orally), Allan J. Hrycay, Portland, for plaintiff.

James E. Tierney, Atty. Gen., Jeffrey Frankel (orally), Asst. Atty. Gen., Augusta, for Bargaining Bd.

Kim Vandermeulen (orally), Augusta, for Pine Tree.

Before: McKUSICK, C.J., and NICHOLS, ROBERTS, GLASSMAN and SCOLNIK, JJ.

NICHOLS, Justice.

The Petitioner, Bayside Enterprises, Inc. (Bayside), appeals from an order of the Superior Court (Waldo County) affirming a decision of the Respondent, Maine Agricultural Bargaining Board (the Board). In its decision the Board declared the Respondent, Pine Tree Poultry Bargaining Committee (Pine Tree), to be a qualified association of poultry producers under the Maine Agricultural Marketing and Bargaining Act (the Act), 13 M.R.S.A. §§ 1953–1965 (1981). On appeal Bayside challenges Pine Tree's qualification to act as bargaining agent for Maine poultry producers, while the Board and Pine Tree both cross-appeal from that portion of the Superior Court's order in which the court concluded that section 1958(4) of the Maine Act was preempted by the federal Agricultural Fair Practices Act, 7 U.S.C. § 2301–2306 (1982).

In all these respects we affirm the judgment below.

Bayside, a Maine corporation located at Belfast, is an integrated poultry processor that markets chicken through a more widely known subsidiary, Penobscot Poultry Company. The processing cycle begins as mature hens suitable for breeding are placed with affiliated farms to begin producing hatching eggs. After the eggs hatch, the newborn chicks are vaccinated and prepared to be raised as roasters, broilers or capons. Bayside then delivers the young chicks to the farms of contract producers who raise the chicks. The contract producers furnish space and labor in raising the chicks and are paid according to a complicated formula. Through the growing-out phase, Bayside supplies feed and veterinary services and retains title to the birds. When the birds reach the proper age, usually after six to twenty weeks, Bayside collects them from the producers for slaughter and processing.

Pine Tree filed its Certificate and Articles of Incorporation with the Secretary of State on August 23, 1984, and proceeded to file with the Board its petition for qualification eight days later. Along with that petition Pine Tree submitted to the Board its corporate documents and bargaining contracts signed by 47 producers. The Board held hearings on September 25, October 24, and December 4, 1984. During the first hearing the Board granted Bayside intervenor status. 5 M.R.S.A. § 9054(1) (1979). Between the first and second hearings, at the Secretary of State's request, Pine Tree refiled its Certificate of Incorporation to correct defects in form. Thereafter, the association executed replacement contracts with about 40 producers, 36 of whom had executed the original contract.

On May 15, 1985, the Board decided that Pine Tree satisfied the Act's qualification criteria.[1] The Board found that, of the 68

---

1. The Board is required to qualify an association if, after hearing, it finds:

 A. That under the charter documents or the bylaws of the association, the association is directly or indirectly producer-owned and controlled;

 B. The association has contracts with its members that are binding under state law;

 C. The association is financially sound and has sufficient resources and management to carry out the purposes for which it was organized;

 D. The association represents 51% of the producers and produced at least ½ of the volume of a particular agricultural product for the specific handler involved with those producers and that agricultural product during the previous 12 months; if the board has reasonable cause to question such representation, the board shall require a secret ballot election to certify the percentage of representation; and

 E. The association has as one of its functions acting as principal or agent for its producer-members in negotiations with handlers for prices and other terms of contracts with respect to the production, sale and marketing of their product.

contract producers supplying Bayside with poultry, 36 were members of the association, and it also found that those 36 members supplied at least half of Bayside's total volume of poultry raised by all contract producers for the year ending August 31, 1984. 13 M.R.S.A. § 1957(3)(D) (1981). On June 19, 1985, Bayside filed a complaint in Superior Court, pursuant to the Maine Administrative Procedures Act, 5 M.R.S.A. § 11001, and M.R.Civ.P. 80C, challenging the Board's qualification decision. After hearing, the court concluded that section 1958(4) was preempted by the federal Agricultural Fair Practices Act (AFPA), 7 U.S.C. §§ 2301–2306 (1982). It concluded, however, that section 1958(4) was severable from the remainder of the Maine Act. In all other respects, the Superior Court affirmed the Board's decision qualifying Pine Tree. Bayside then appealed, and the Board and Pine Tree cross-appealed, from the court's decision invalidating section 1958(4) of the Maine Act.

■ We advert first to the contention, advanced by both the Board and Pine Tree, that the Superior Court erred in finding section 1958(4) of the Maine Act to be preempted by AFPA.[2] At the threshold we are mindful that judicial decision-making in the preemption area is ad hoc in nature, with the outcome in each case necessarily governed by the regulatory scheme and policy objectives of the particular statutes being reviewed. Hirsch, *Toward a New View of Federal Preemption*, 1972 U.Ill. L.F. 515, 520–21 (1972). There are three situations in which federal law may preempt state law. *Michigan Canners & Freezers Association, Inc. v. Agricultural Marketing and Bargaining Board*, 467 U.S. 461, 104 S.Ct. 2518, 81 L.Ed.2d 399 (1984); *See also Rozanski v. A–P–A Transport, Inc.*, 512 A.2d 335 (Me.1986).

Here there is neither express preemption nor an implied congressional intent to occupy the entire field of regulation concerning agricultural marketing and bargaining. Nothing in AFPA expressly preempts any or all state action; in fact, Congress' express intent is quite the opposite: AFPA "shall not be construed to change or modify existing state law." 7 U.S.C. § 2305(d) (1982); *Michigan Canners*, 467 U.S. at 469, 104 S.Ct. at 2523. The federal statute declares a policy of fair dealing between handlers and producers of agricultural products, while affirming the right of individual producers either to join cooperative associations or to remain independent. Sections 2301, 2303(a). The Maine Act, while echoing the policy objectives of the AFPA, goes beyond the federal statute in more extensively regulating the activities of producers' associations. Thus we are not dealing here with statutes that are in direct conflict. Instead, the issue is whether section 1958(4) of the Maine Act "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941).

■ In determining whether a state statute hinders the achievement of federal policy, courts must first ascertain Congress' objectives and then decide whether a conflict exists. *Perez v. Campbell*, 402 U.S. 637, 644, 91 S.Ct. 1704, 1708, 29 L.Ed.2d 233 (1971); Note, *Burger Court and Preemption Doctrine: Federalism in the Balance*, 60 Notre Dame L.Rev. 1233, 1236. Congress' intent in enacting AFPA can readily be discerned from a reading of the statute. Individual farmers, the statute declares, should be "free to join together voluntarily in cooperative associations as authorized by law." 7 U.S.C. § 2301 (1982). Handlers of agricultural products are prohibited from coercing a producer

---

13 M.R.S.A. § 1957(3) (1981).

**2.** Bayside argues for the first time on appeal that section 1958(5) and sections 1965(1)(G) and (H) of the Maine Act are preempted as well. It did not challenge these three provisions in Supe-

rior Court, and accordingly Bayside has not preserved for appellate review its argument as to these three subsections. *Cyr v. Cyr*, 432 A.2d 793, 797 (Me.1981).

into either joining or refusing to join an association. Section 2303(a). Associations of producers are included in the definition of "handler." Section 2302(a); *Marketing Assistance Plan, Inc. v. Associated Milk Producers,* 338 F.Supp. 1019, 1024 (S.D. Tex.1972).[3] Individual producers are thus shielded under AFPA from coercion by either processors or associations.

In enacting AFPA, Congress ordained as a matter of national policy that individual producers should not be penalized for choosing to remain independent. *Michigan Canners,* 467 U.S. at 464, 104 S.Ct. at 2520. This policy led the United States Supreme Court in *Michigan Canners* to invalidate a state statute to the extent that it required all producers to pay membership fees to qualified associations and to adhere to contracts negotiated by the association with handlers, even though a producer did not wish to join the association. *Id.* at 466 & n. 5, 104 S.Ct. at 2521 & n. 5. The Court recognized that the theme of voluntariness in the AFPA is carried through from the declaration of policy to the provisions of the Act defining the prohibited practices. *Id.* 467 U.S. at 470, 104 S.Ct. at 2524, 81 L.Ed.2d at 407. The legislative history of the AFPA further confirms that Congress intended to shield producers from coercion or improper pressure by both processors and producers' associations. *Id.* 467 U.S. at 473, 104 S.Ct. at 2525, 81 L.Ed.2d at 409; *see* S.Rep. No. 474, 90th Cong. 1st Sess. S (1967); 113 Cong.Rec. 21411 (1967).

■ Section 1958(4) of the Maine Act conflicts with AFPA's policy objectives. The statute provides:

It shall be unlawful for a handler to negotiate with other producers of a product with respect to the price, terms of sale, compensation for commodities produced under contract and other contract provisions relative to such product while negotiating with a qualified bargaining association able to supply all or a substantial portion of the requirements of such handler for such product.

13 M.R.S.A. § 1958(4) (1981). Unlike the statute the Supreme Court invalidated in *Michigan Canners,* section 1958(4) does not directly compel individual producers to join an association. Section 1958(4) is no less coercive, however, for it gives associations a significant advantage over individual producers. Individuals are prohibited from bargaining with a handler while the association is in negotiations with that same handler. The bargaining process may take several years, perhaps leading to litigation. Moreover, if the association and the handler eventually were to reach agreement, and the association were able to supply all of the handler's needs, the independent producer who gambled on his freedom could be frozen out of the market, ending up with no sale for his services.

Nonetheless, the Board contends that 13 M.R.S.A. § 1958(4) does not conflict with AFPA because handlers may continue to purchase services from individual producers while at the same time bargaining with the association. That contention begs the question. A handler cannot buy services from an independent producer without first negotiating an agreement with the producer. Under the Board's view, independents would still be at a significant disadvantage:

3. Although the term "handler" generally refers to buyers and processors of agricultural products, such as Bayside, as the AFPA evolved, Congress expanded the definition to include associations of producers. Thus Section 2302(a) now provides:

The term "handler" means any person engaged in the business or practice of (1) acquiring agricultural products from producers or associations of producers for processing or sale; (2) grading, packaging, handling, storing, or processing agricultural products re-

ceived from producers or associations of producers; or (3) contracting or negotiating contracts or other arrangements, written or oral, with or on behalf of producers or associations of producers with respect to the production or marketing of any agricultural product; or (4) acting as an agent or broker for a handler in the performance of any function or act specified in clause (1), (2), or (3) of this paragraph.

The definition of "handler" in the Maine Act is nearly identical. 13 M.R.S.A. § 1955(3).

The association could bargain for and obtain new terms, while the luckless independent would remain obligated under the original contract and might never gain the benefit of the new terms. In sum, section 1958(4) effectively coerces independent producers to join an association in order to avoid the possibility of being closed out of the marketplace. We therefore hold that section 1958(4) conflicts with and is preempted by the federal Agricultural Fair Practices Act.

Our inquiry does not end here, however, since we must now determine whether 13 M.R.S.A. § 1958(4) is severable from the rest of the Act. Bayside contends that section 1958(4) is the heart of the Act and that the Act cannot be given effect if the section is excised. The Superior Court concluded otherwise and found section 1958(4) severable.

 The invalidation of one statutory provision will not result in the remainder of the statute being invalidated if the remainder can be given effect without the invalid provision. 1 M.R.S.A. § 71(8) (1979); *Lambert v. Wentworth*, 423 A.2d 527, 535 (Me. 1980). If the invalid provision is such an integral part of the statute that the Legislature would only have enacted the statute as a whole, then the entire statute is invalid. *Town of Windham v. LaPointe*, 308 A.2d 286, 291 (Me.1973). The Act has several significant purposes, among them the creation of the handler's duty to bargain in good faith with qualified associations of producers, the delineation of procedures for qualifying associations, and the definition of unfair practices. The reach of section 1958(4) is short; it is in no way central to any of these purposes. With that section removed, the Act can continue to regulate effectively the relationship between handlers and associations and govern the enforcement of its enumerated unfair practices. We conclude that 13 M.R.S.A.

§ 1958(4) is indeed severable from the rest of the Act.

Bayside next challenges the Board's conclusion that Pine Tree satisfied the Act's representational requirements.[4] Those requirements are met if:

> The association represents 51% of the producers and produced at least ½ of the volume of a particular agricultural product for the specific handler involved with those producers and that agricultural product during the previous 12 months; if the board has reasonable cause to question such representation, the board shall require a secret ballot election to certify the percentage of representation. . . .

13 M.R.S.A. § 1957(3)(D) (1981). In deciding whether Pine Tree satisfied section 1957(3)(D), the Board counted as association members those producers who raised poultry for Bayside and who had executed both original and replacement contracts with Pine Tree. The Board observed, however, that producer Carol Hegstrom signed only an original contract, while William Hegstrom signed only a replacement contract. Since both Carol and William bore the same surname and shared the same address, the Board inferred they were married, and it accordingly counted them as a single producer.

 Bayside now argues that the Board acted improperly in counting Carol and William Hegstrom as a single producer. The corporation contends that there was insufficient evidence from which the Board could have inferred that the Hegstroms were married and, further, that the Board's conclusion contravenes the established rule that a husband's separate contract cannot bind his wife. *See* 19 M.R.S.A. §§ 161, 162 (1981). However, Bayside failed to raise this issue seasonably either before the Board or in Superior Court. During the hearing before the Board Bayside entered a general objection to the admission into

---

**4.** Our review of the agency's conclusion is governed by *Spear v. Maine Unemployment Insurance Commission et al.*, 505 A.2d 82, 83 (Me. 1986). Since the Superior Court acted as an intermediary appellate court, we review the agency's decision directly.

evidence of the replacement contracts; never on this specific ground did it object to the inclusion of William Hegstrom's contract. *See Hale v. Petit*, 438 A.2d 226, 232 (Me.1981) (parties in administrative proceeding must raise objections to agency's practice at administrative level to preserve appeal rights). Nor did Bayside in its Superior Court brief raise the Hegstrom issue; only at oral argument before us, and then in a cursory manner, did its counsel mention the issue. *See Chadwick BaRoss, Inc. v. Martin Marietta Corp.*, 483 A.2d 711, 717 (Me.1984) (issue not discussed in brief but raised for first time at oral argument held not preserved for appellate review). Therefore we conclude Bayside did not preserve its objection to the Hegstrom contracts.[5]

The other issues Bayside raises do not merit discussion.

The entry is:

Judgment affirmed.

All concurring.

---

**5.** Even on the merits Bayside's argument concerning the Hegstrom contracts does not withstand analysis. The actual relationship between Carol and William Hegstrom is not dispositive. As the Board observed in its decision, the record contains several examples of single farms operated by families. That fact, coupled with Carol and William having the same surname and address, was sufficient to support an inference that the Hegstroms operated a family farm. Under the Act, a producer is defined as "one *or more* individuals." 13 M.R.S.A. §§ 1955(4), (5) (1981) (emphasis supplied). Accordingly, since a producer need not be a single person, the two Hegstroms could properly have been counted as a single producer for purposes of section 1957(3)(D).