**MAINE YANKEE ATOMIC POWER COMPANY**

v.

**MAINE PUBLIC UTILITIES COMMISSION.**

Supreme Judicial Court of Maine.

Argued Sept. 18, 1990.
Decided Oct. 25, 1990.

Michael T. Healy (orally), Charles Harvey, Christopher J. Devlin, Verrill & Dana, Portland, for appellants.

Anthony W. Buxton, Preti, Flaherty, Beliveau & Pachios, Augusta, for Indus. Energy Consumer Group.

Peter B. Kelsey, Laurence W. Brown, Washington, D.C., for amici curiae Edison Elec. Institute.

Frances E. Francis, Margaret A. McGoldrick, Barbara S. Esbin, Washington, D.C., for amici curiae Consumer–Owned Purchasers.

James A. Buckley (orally), Maine Public Utilities Com'n, Augusta, for appellee.

Before ROBERTS, WATHEN, GLASSMAN, CLIFFORD, COLLINS, and BRODY, JJ.

WATHEN, Justice.

Maine Yankee Atomic Power Company ("Maine Yankee") appeals the February 22, 1990 order of the Maine Public Utilities Commission ("MPUC") purporting to establish Maine Yankee's cost of decommissioning and to fix the amounts which Maine Yankee must pay annually to its decommissioning trust fund, pursuant to Maine's Nuclear Decommissioning Financing Act ("NDFA"), 35–A M.R.S.A. §§ 4351–4359 (1988).

At the heart of this appeal lies a jurisdictional issue. Maine Yankee maintains that a federal agency, the Nuclear Regulatory Commission ("NRC"), has exclusive jurisdiction over nuclear decommissioning which it exercises in conjunction with the ratemaking agency, the Federal Energy Regulatory Commission ("FERC"). The MPUC, however, asserts that it has concurrent jurisdiction to review and approve any proposed decommissioning financing plan, pursuant to the NDFA. We determine that federal law preempts the NDFA.

Maine Yankee, a licensed nuclear electric generating facility in Wiscasset, is owned by a group of investor-owned electric utilities ("the sponsors") located in Maine, Massachusetts, New Hampshire, Connecticut, and Vermont. Maine Yankee sells to these sponsors, at wholesale, its entire output of electricity on a basis proportional to each sponsor's ownership of the company.

Pursuant to the Atomic Energy Act of 1954, as amended, and the Energy Reorganization Act of 1974, as amended, the NRC is statutorily mandated "to protect the radiological health and safety of the public." General Requirements for Decommissioning Nuclear Facilities, 53 Fed.Reg. 24018, 24037 (1988). In keeping with this mandate, the NRC promulgated a rule requiring

reasonable assurance that at the time of the termination of operations [of nuclear facilities] adequate funds are available so that decommissioning can be carried out in a safe and timely manner and that lack of funds does not result in delays that may cause potential health and safety problems.

*Id.* On July 27, 1988, the NRC's general requirements for decommissioning nuclear facilities became effective. *Id.* at 24018–19.

Although the NRC is not authorized to regulate rates or to interfere with the decisions of state or federal agencies respecting the economics of nuclear power, the NRC is responsible for promulgating "rules prescribing allowable funding methods for meeting decommissioning costs." *Id.* at 24037 (citing *Pacific Gas & Electric Co. v. State Energy Resources Conservation & Development Comm.*, 461 U.S. 190, 212–13, 217–19, 103 S.Ct. 1713, 1726–27, 1729–30, 75 L.Ed.2d 752 (1983)). In setting forth technical and financial criteria for decommissioning licensed nuclear facilities, the NRC took care to clarify the roles of the state public utility commissions and the Federal Energy Regulatory Commission. To FERC the NRC ascribes

> the responsibility for setting rates for the *transmission and sale (wholesale) of electricity by investor-owned utilities in interstate commerce* and authorizes the conditions, rates, and charges for interconnections among electric utilities.... State public utility commissions have the responsibility for setting rates for *retail* sales of electricity to homeowners and companies doing business in their states.

53 Fed.Reg. at 24037–38 (emphasis added). As a company engaged in the "transmission and sale (wholesale) of electricity by investor-owned utilities in interstate commerce," Maine Yankee is subject only to the jurisdiction of FERC for the regulation of its utility service and rates. The rates fixed by FERC provide for the costs of operating the plant as well as a return through depreciation of Maine Yankee's investment in the plant. Thus, Maine Yankee asserts that FERC has jurisdiction over its decommissioning plan since "decommissioning expenses have historically been and continue to be treated by FERC as depreciation and booked as negative salvage."

On October 5, 1981, Maine Yankee made a rate increase filing with FERC, seeking "to reflect in its rates the estimated costs of decommissioning" its nuclear generating plant. *Maine Yankee Atomic Power Co.,* 20 F.E.R.C. ¶ 61,141 at p. 61,308 (1982). On October 29, 1981, the MPUC filed a notice of intervention with FERC and took the position that Maine Yankee should "supplement or modify its filing with a 'rate schedule' which provides for (1) the billing of decommissioning costs in accordance with the method approved by the M.P.U.C. ... and (2) the segregation of decommissioning funds in a separate account to be used solely for decommissioning purposes." On March 30, 1982, Maine Yankee filed a proposed settlement agreement which attempted to resolve the issues in the subsequent FERC proceeding. *Id.* Meanwhile, on April 15, 1982, the Maine Legislature enacted the Nuclear Decommissioning Financing Act, now codified at 35–A M.R.S.A. §§ 4351–4359 (1988). The NDFA creates a specific mechanism for establishing a decommissioning financing plan and requires any licensee operating a nuclear power plant in Maine to file a proposed plan with the MPUC for review and ultimate approval. *Id.* at § 4353(1–3).

On August 3, 1982, FERC issued its order approving the March 30, 1982 settlement agreement and expressing the view, with regard to the NDFA, that there should be "consistency with the states ... to the extent that it allows us to properly carry out our duties under the Federal Power Act." *Maine Yankee Atomic Power Co.,* 20 F.E.R.C. at p. 61,310. The MPUC did not appeal this order. Since that time, Maine Yankee and the other parties to this litigation, including the MPUC, have participated in litigated FERC proceedings in 1985 and 1988. *Maine Yankee Atomic Power Co.,* 31 F.E.R.C. ¶ 61,068 (1985); *Maine Yankee Atomic Power Co.,* 44 F.E.R.C. ¶ 61,368 (1988). In each of these cases, the parties negotiated the appropriate cost estimate and funding level for decommissioning expenses and reached a binding settlement; no appeals were taken.

On September 13, 1982, Maine Yankee filed its proposed decommissioning financing plan with the MPUC; on November 12, 1982, the MPUC notified the company that

its filing was incomplete; and on December 7, 1982, the MPUC granted Maine Yankee's request for additional time to supplement its filing. Since then, both parties continued to process the case, but no final plan was ever approved by the MPUC. On August 29, 1983, the MPUC approved a stipulation entered into by the parties as an interim decommissioning financing plan.

On January 15, 1988, Maine Yankee petitioned FERC to modify the period over which it would collect decommissioning costs to 10 years, increase its annual decommissioning charges accordingly, and decrease the level of return on common equity that the company could collect. *Maine Yankee Atomic Power Co.*, 42 F.E.R.C. ¶ 61,307 at p. 61,920 (1988). According to Maine Yankee, these changes "would have permitted the company to fix decommissioning expense based on Maine Yankee's most recent estimate of $178,097,900 and to fund for decommissioning expense at the level of $14,466,467 per year over the course of ten years." On February 8, 1988, the MPUC filed an intervention, making it a party to the proceeding. *Id.* In its March 15, 1988 order, FERC rejected Maine Yankee's proposed accelerated decommissioning schedule and required the company to "file revised rates, reflecting recovery of decommissioning costs over the nuclear unit's remaining life." *Id.* at p. 61,923.

On July 27, 1988, Maine Yankee submitted an uncontested settlement agreement which FERC approved on September 20, 1988, establishing a decommissioning cost basis of $167,000,000 and a fixed rate of return on common equity at 12.9%. *Main Yankee Atomic Power Co.*, 44 F.E.R.C. ¶ 61,368 at p. 62,224 (1988). In addition, the parties agreed to a "stay-out" provision prohibiting Maine Yankee from making "a filing to place into effect prior to February 16, 1991, any increase in the level of annual decommissioning charges

above that stated in [the settlement agreement]."

On March 20, 1989, Maine Yankee moved that the MPUC approve an amendment to the August 29, 1982 interim decommissioning financing plan which reflected the provisions of the September 20, 1988 FERC order, converting it into an MPUC-approved decommissioning finance plan. On November 17, 1989, hearings began on the issue, and, on November 29, 1989, Maine Yankee, the Public Advocate, and the Industrial Energy Consumer Group ("IECG")[1] filed a stipulation of the issues in the case. On February 22, 1990, the MPUC rejected the stipulation and Maine Yankee's decommissioning financing plan, finding that "$178,097,900 is the most reasonable estimated cost of decommissioning," and ordered that Maine Yankee increase, effective March 1, 1990, its annual contributions to the decommissioning trust fund by $719,961, for a total contribution of $9,793,904.

On March 23, 1990, the MPUC stated that additional funding amounts required under its February 22, 1990 order must be supplied from Maine Yankee's assets or the assets of the sponsors, and granted a request to stay the February 22, 1990 order pending Maine Yankee's appeal to this Court.

▪ The supremacy clause of the United States Constitution provides that the law of the United States "shall be the supreme Law of the Land...." U.S. Const. art. VI, cl. 2. Thus, under certain circumstances, federal law will preempt even validly enacted state law. In the recent case of *Cent. Maine Power Co. v. Town of Lebanon*, 571 A.2d 1189 (Me.1990), we reiterated the principles of preemption:

"Preemption occurs when Congress, in enacting a federal statute, expresses a clear intent to preempt state law, when there is an outright or actual conflict

---

**1.** The Industrial Energy Consumer Group ("IECG") is an incorporated association of large industrial consumers of energy located within the State of Maine. Its members are Champion International, International Paper Company, Keyes Fibre Company, United Timber Corpora- tion, Cyro Industries, the Maine Textile Council, Boise Cascade Corporation, Forester Manufacturing Company and James River Corporation. A petition to intervene was filed by this group on May 24, 1989, and subsequently granted.

between federal and state law, where compliance with both federal and state law is in effect physically impossible, where there is implicit in federal law a barrier to state regulation, where Congress has legislated comprehensively, thus occupying an entire field of regulation and leaving no room for the States to supplement federal law, or where the state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress."

*Id.* at 1191 (quoting *Louisiana Public Service Comm. v. F.C.C.*, 476 U.S. 355, 368–69, 106 S.Ct. 1890, 1898–99, 90 L.Ed.2d 369 (1986) (citations omitted)). The exercise of federal supremacy should not be presumed lightly. *Cent. Maine Power Co. v. Town of Lebanon*, 571 A.2d at 1191. Nevertheless, when no other conclusion is possible given the nature of the regulated subject matter, or Congress has clearly ordained this result, federal law must preempt conflicting state law. *Director of Bureau of Labor Standards v. Fort Halifax Packing Co.*, 510 A.2d 1054, 1057 (Me.1986).

■ Preemption occurs whenever state law conflicts with federal law in such a way that it becomes impossible to comply with both simultaneously. *California v. F.E.R.C.,* — U.S. ——, 110 S.Ct. 2024, 109 L.Ed.2d 474 (S.Ct.1990) (quoting *Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 248, 104 S.Ct. 615, 621, 78 L.Ed.2d 443 (1984)); *see also Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 108 S.Ct. 1145, 1150–51, 99 L.Ed.2d 316 (1988). Such a conflict "may be direct, in that the state regulation obviously contradicts federal regulation, or it may arise from Congressional intent, either express or implied, to occupy a particular area." *Director of Bureau of Labor Standards v. Fort Halifax Packing Co.*, 510 A.2d at 1057. Courts must first ascertain the objectives of Congress before determining whether a state statute hinders the achievement of federal policy. *Bayside Enter. v. Maine Agricultural Bargaining Bd.*, 513 A.2d 1355, 1358 (Me.1986).

■ A federal agency acting within the scope of its congressionally delegated authority may also preempt state regulation.

*Louisiana Pub. Serv. Comm. v. F.C.C.*, 476 U.S. at 369, 106 S.Ct. at 1898–99; *see also Fidelity Fed. Sav. and Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982) ("Federal regulations have no less pre-emptive effect than federal statutes."). Thus, if the NRC and FERC are acting within the scope of their congressionally delegated authority in asserting exclusive jurisdiction over Maine Yankee's decommissioning plan, the MPUC order and the NDFA are preempted.

■ Maine Yankee claims that the MPUC order and the NDFA should be preempted because (1) they interfere impermissibly with FERC's jurisdiction over wholesale rates and (2) they intrude on a field which has been pervasively and exclusively regulated by Congress.

1. *Impermissible interference with FERC's jurisdiction*

It is undisputed that FERC has jurisdiction for setting rates for "the transmission and sale (wholesale) of electricity by investor-owned utilities in interstate commerce." 53 Fed.Reg. at 24037–38; *see also Mississippi Power & Light Co. v. Moore*, 487 U.S. 354, 108 S.Ct. 2428, 2439, 101 L.Ed.2d 322 (1988) ("FERC has exclusive authority to determine the reasonableness of wholesale rates."). Maine Yankee argues that the MPUC order directly conflicts with the valid exercise of this ratemaking jurisdiction in several significant respects.

FERC's March 15, 1988 rate order included four specific components of Maine Yankee's costs of service: 1) the rate of return on common equity; 2) amortization of materials and supplies and last core nuclear fuel; 3) decommissioning expense; and 4) other depreciation. The MPUC order, retroactive to March 1, 1990, alters the effect of this order, fixing Maine Yankee's decommissioning expense at $719,961 more per year than the March 15, 1988 FERC order and providing for Maine Yankee's sponsors a lower rate of return.

■ The decommissioning funding level is a stated amount which cannot vary without FERC approval. *Cent. Vermont*

*Pub. Serv. Corp.*, 44 F.E.R.C. ¶ 61,278 at p. 62,027 (1988); *see also Yankee Atomic Electric Co.*, 30 F.E.R.C. ¶ 61,111, at p. 61,202 (1985). It is one cost of service component which contributes to the establishment of Maine Yankee's utility rate. Under the "filed rate doctrine" developed under federal law, a federally regulated utility is precluded from collecting any rate other than that on file with the Commission, and the MPUC cannot interfere with the rate set by FERC or the components that go into it. *Nantahala Power and Light Co. v. Thornburg*, 476 U.S. 953, 963, 106 S.Ct. 2349, 2355, 90 L.Ed.2d 943 (1986); *see also Mississippi Power & Light Co. v. Moore*, 108 S.Ct. at 2438–39.

FERC has held that decommissioning expense, like depreciation, should be collected from ratepayers as a cost of service. *Indiana and Michigan Mun. Distrib. Ass'n v. Indiana Michigan Power Co.*, 49 F.E.R.C. ¶ 63,020 at p. 65,084 (1989); *Middle South Energy, Inc.*, 31 F.E.R.C. ¶ 61,305 at p. 61,658 (1985). Pursuant to the "stay-out" provision in the March 15, 1988 FERC order, however, Maine Yankee cannot file for a rate increase that would become effective prior to February 16, 1991. Thus, the company is prevented from raising the revenues necessary to meet the demands of the MPUC order, retroactive to March 1, 1990, by FERC's requirement that decommissioning costs come from ratepayers and Maine Yankee's agreement to delay any rate increase until after February 16, 1991. Given this scenario, it is impossible for Maine Yankee to comply with both the March 15, 1988 FERC order and the February 22, 1990 MPUC order. Applying the principles of preemption set forth earlier, the MPUC order is preempted.

■ Contrary to FERC policy, the MPUC has directed Maine Yankee to raise revenues from the company's own assets and the assets of its sponsors. FERC fixed the rate of return for Maine Yankee's sponsors at 12.9% in the March 15, 1988 order. In requiring that additional funding for decommissioning come from the assets of Maine Yankee and its sponsors, the MPUC is impermissibly mandating a reduction in the sponsors' rate of return and weakening the company's financial base. The MPUC has no authority to require a reduction in a component of Maine Yankee's rates, set exclusively by FERC. Any attempt to do so is preempted by FERC. *See Safe Harbor Water Power Corp. v. Fed. Power Comm.*, 179 F.2d 179, 201 (3rd Cir.1949) ("The amount of rate of return is preeminently a question for determination by the Commission." [2]); *F.P.C. v. Hope Natural Gas Co.*, 320 U.S. 591, 605, 64 S.Ct. 281, 289, 88 L.Ed. 333 (1944) (Setting valid rates enables a company "to operate successfully, to maintain its financial integrity, to attract capital, and to compensate its investors for the risks assumed.").

Without merit is the MPUC's assertion that its order does not interfere with rate setting, but, like a state income tax, merely affects Maine Yankee's rates indirectly. The United States Supreme Court has held that "the filed rate doctrine is not limited to 'rates' *per se*." *Nantahala v. Thornburg*, 476 U.S. at 966, 106 S.Ct. at 2357. In *Mississippi Power & Light Co. v. Moore*, the Court stated that FERC's exclusive jurisdiction applies not only to rates, but to the components that affect wholesale rates. *Mississippi Power & Light Co. v. Moore*, 108 S.Ct. at 2439 ("FERC's exclusive jurisdiction applies not only to rates, but also to power allocations that affect wholesale rates.") While in that case the component at issue was power allocations, the principle applies equally well to decommissioning financing. Both directly affect the calculation of reasonable wholesale rates over which FERC exercises exclusive jurisdiction. Furthermore, the impact of the decommissioning financing plan imposed by the MPUC cannot validly be compared to the impact of a state tax. State taxes are not set by the federal government while

---

**2.** The Federal Power Commission ("FPC") was FERC's predecessor as a ratemaking agency. Responsibility for the establishment, review, and enforcement of rates and charges for the transmission or sale of electric energy was transferred from the FPC to FERC by 42 U.S.C. §§ 7172(a)(1)(B), 7293 (1983).

Maine Yankee's decommissioning expenses are and have been set by FERC.

Thus, the MPUC order and the NDFA interfere impermissibly with FERC's exclusive jurisdiction over wholesale rates and are preempted by the supremacy clause of the United States Constitution.

### 2. *Intrusion on a field which has been pervasively and exclusively regulated by Congress*

▮ When Congress has manifested an intent to occupy a particular area through a comprehensive scheme of federal regulation, federal law will preempt state regulation in that area. Congressional intent to occupy an area of law

> may be inferred where the pervasiveness of the federal regulation precludes supplementation by the States, where the federal interest in the field is sufficiently dominant, or where "the object sought to be obtained by the federal law and the character of obligations imposed by it ... reveal the same purpose." ...
> [E]ven where Congress has not entirely displaced state regulation in a particular field, state law is pre-empted when it actually conflicts with federal law.

*Schneidewind v. ANR Pipeline Co.*, 108 S.Ct. at 1150 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)).

In *Pacific Gas & Electric Co. v. State Energy Resources Conservation & Dev. Comm.*, 461 U.S. 190, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983), the Supreme Court made it clear that state regulation of nuclear power is preempted when its purpose is to regulate safety, even when it does not directly conflict with federal law, because "the Federal Government has occupied the entire field of nuclear safety concerns, except the limited powers expressly ceded to the States." *Id.* at 212, 103 S.Ct. at 1726. Since the passage of the Atomic Energy Act in 1954, Congress has preserved a dual system of regulation, with the federal government maintaining "complete control of the safety and 'nuclear' aspects of energy generation" and "the states exercising traditional authority over the need for addi-

tional generating capacity, the type of generating facilities to be licensed, land use, [retail] ratemaking, and the like." *Id.*

Maine Yankee argues that "federal law governs nuclear decommissioning chiefly through three interrelated regulatory schemes:" (1) Nuclear Regulatory Commission regulations; (2) certain provisions of the Federal Power Act; (3) section 468A of the Internal Revenue Code.

▮ The MPUC concedes that the NRC has exclusive control over the health and safety aspects of nuclear decommissioning. It disputes, however, the validity of Maine Yankee's assertion that NRC's jurisdiction extends to the economics of decommissioning.

Economic regulation of nuclear power has traditionally been granted to the states. *Id.* Nevertheless, the NRC has acknowledged its authority, granted by the Atomic Energy Act of 1954, as amended, and the Energy Reorganization Act of 1974, as amended, to

> take whatever regulatory actions may be necessary to protect the public health and safety, including the promulgation of rules prescribing allowable funding methods for meeting decommissioning costs. The fact that these regulatory actions may have an economic impact does not mean that they lie outside NRC's jurisdiction.

53 Fed.Reg. at 24037 (citations omitted). NRC's rule amendments permit the appropriate state or federal rate-setting agency to regulate funding for decommissioning; in the case of *wholesale* rate setting, that agency would be FERC. *Id.* at 24037–38.

The Federal Power Act, 16 U.S.C. §§ 824–825, declares that there will be federal regulation "of the transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce," provided this regulation extends "only to those matters which are not subject to regulation by the States." *Id.* at § 824(a). In this case, the decommissioning of an atomic power plant engaged in the wholesale marketing of electricity in interstate commerce is not a matter subject to regulation by the state. Thus, by the

authority of the Federal Power Act, state regulation must be preempted in this area.

It is undisputed that FERC requires utilities over which it exercises jurisdiction to follow I.R.C. § 468A (1988) which permits deductibility of amounts contributed to the decommissioning trust fund only to the extent such expense is included in rates. Maine Yankee contends that FERC's incorporation of IRC § 468A into the FERC regulatory scheme, as occurred in *Systems Energy Resources, Inc.*, 37 F.E.R.C. 61,261 at p. 61,726–27 (1986) ("SERI") "shows that the IRS regulations are not only a direct federal oversight of decommissioning fund policy, but are also inextricably interwoven into FERC's exercise of its own jurisdiction." The MPUC disputes this contention, claiming that Maine Yankee has failed to show that this incorporation indicates that Congress has granted IRS federal oversight of decommissioning fund policy. In either case, this issue is not determinative as it has already been shown that Congress intended to dominate the field of nuclear safety concerns.

When "the object sought to be obtained by the federal law and the character of obligations imposed by it ... reveal the same purpose" as those sought by state regulation, the state regulation is preempted. *Schneidewind v. ANR Pipeline Co.*, 108 S.Ct. at 1150 (citation omitted). In enacting the NDFA, the Legislature stated that "timely proper decommissioning of any nuclear power plant ... is essential to protect public health, safety and the environment." 35–A M.R.S.A. at § 4351. Because Congress has clearly manifested an intent to maintain "complete control over the safety and 'nuclear' aspects of energy generation," the NDFA is preempted. *Pacific Gas & Electric Co. v. State Energy Resources Conservation & Dev. Comm.*, 461 U.S. at 212, 103 S.Ct. at 1726.

The entry is:

The February 22, 1990 order is vacated.

All concurring.