**PHARMACEUTICAL CARE MANAGEMENT ASSOCIATION,**
Plaintiff

v.

**MAINE ATTORNEY GENERAL,**
Defendant

No. CIV.03–153–B–H.

United States District Court,
D. Maine.

July 7, 2004.

John J. Aromando, Esq., Catherine R. Connors, Esq., Pierce Atwood, Portland, ME, Paul J. Ondrasik, Jr., Esq., Martin D. Schneiderman, Esq., Steptoe & Johnson, Washington, DC, for Pharmaceutical Care Management Association, plaintiff.

Ronald W. Lupton, Esq., Andrew L. Black, Esq., Assistant Attorney Generals, Augusta, ME, John R. Brautigam, Esq., Falmouth, ME, for Main Attorney General, defendant.

## ORDER ON DEFENDANT'S MOTION TO AMEND THE ORDER OF PRELIMINARY INJUNCTION

HORNBY, District Judge.

On March 9, 2004, Judge Woodcock granted the plaintiff's motion for a preliminary injunction against enforcement of Maine's Unfair Prescription Drug Practices Act ("UPDPA"), 22 M.R.S.A. § 2699 (2004). He found that the plaintiff was likely to succeed on a claim that one statutory provision amounted to an unconstitutional taking and that ERISA generally preempted the Maine statute. Thereafter Judge Woodcock recused himself and the case was assigned to me. The Attorney General has moved to amend or vacate the earlier preliminary injunction on two major grounds: first, that later legislation has cured any defects; and second, that any defective parts of the statute can be severed and that the remainder should be enforced. The motion to amend is DENIED.

### I. EFFECT OF RELEVANT AMENDMENTS

#### A. ERISA Preemption

In his opinion granting the motion for preliminary injunction, Judge Woodcock concluded that "the provisions of the UPDPA are virtually bound to collide with the ERISA goal of a 'nationally uniform

administration of employee benefit plans.'" Order Granting Mot. for Prelim. Inj. at 23 (Mar. 9, 2004) (Docket Item 28). He supported his conclusion by way of example. I only summarize his treatment, because the full discussion is available in Judge Woodcock's opinion. Basically, Judge Woodcock pointed out that the Maine statute imposed a duty on pharmaceutical benefits management companies ("PBMs") both to their clients (covered entities, in Maine statutory terms) and to the ultimate beneficiaries, the human beings who end up taking the prescribed medicines. *See id.* The Maine statute gave both the covered entities and the ultimate beneficiaries the right to sue in state court if they were unhappy. *See id.* at 24. Another part of the statute provided that PBMs can order more expensive drug substitutions only when the substitutions benefit both the client and the beneficiary. *Id.* at 23. (citing 22 M.R.S.A. § 2699(2)(E)(2)). Judge Woodcock noted that substitution of a more expensive drug easily could make the beneficiary happy, but the bill-paying covered entity unhappy. *Id.* at 23–24. Judge Woodcock concluded this part of his discussion, saying: "This example is *only the first of a host of issues* that this court concludes will find their way to state court as an inevitable consequence of the duties and remedies the UPDPA creates." *Id.* at 25 (emphasis added). Then he went on to analyze the preemption issue accordingly:

The decision as to what drug to prescribe, the price of the drug, the comparative medical efficacy of the drug, and the disclosure requirements to the covered entity and covered individual all seem to fall squarely within the First Circuit's concern: state law interference with the administration of [ERISA] covered employee benefit plans, purporting to regulate plan benefits or impose additional reporting requirements.

*Id.* (citing *Carpenters Local Union No. 26 v. United States Fidelity & Guar. Co.,* 215 F.3d 136, 141 (1st Cir.2000)). He next described the state court remedies the UPDPA created and how they conflict with the federal enforcement scheme. He concluded: "The terms of the UPDPA and its enforcement mechanisms intrude too far into the ambit of federal regulation of health benefits by ERISA plans. Therefore, the UPDPA has an impermissible 'connection with' ERISA." *Id.* at 26.

In this motion seeking that I alter the scope of, or rescind altogether, Judge Woodcock's preliminary injunction, the Attorney General reasons:

Parsing out the language of the decision, it appears that the Court's conclusion arises substantially or entirely from the effect of the UPDPA imposing on PBMs a duty to covered individuals that can be enforced under state law.

Def.'s Supplemental Mem. in Support of His Mot. to Amend the Order of Prelim. Inj. at 5 (Docket Item 47). The Attorney General points out that since Judge Woodcock's decision, the State has amended the UPDPA to eliminate any PBM duties to ultimate beneficiaries, and has amended the drug substitution provision.[1] Now the

---

1. The Maine Legislature enacted two pieces of legislation to amend the UPDPA. The first, dealing directly with disclosure provisions (*i.e.,* amending 22 M.R.S.A. §§ 2269(2)(D) and (G)) was enacted on an emergency basis and is now effective. P.L.2003, ch. 688, § C–9—C–11 (Ex. B, Docket Item 47). The second, dealing with ERISA issues (*i.e.,* eliminat-

ing any duties of PBMs to covered individuals and removing provisions that might affect a PBM's decision to select a particular drug for a plan participant by repealing 22 M.R.S.A. § 2699(2)(B) and amending 22 M.R.S.A. § 2699(2)(E)(2)), will be effective on July 30, 2004. P.L.2003, ch. 673 §§ FFF–1, FFF–2 (Ex. A, Docket Item 47). Due to the proximi-

latter provision requires only that a PBM notify its client (the covered entity) of the respective drug prices and of any financial benefit the PBM obtains for making the substitution. According to the Attorney General, these amendments remove "provisions that might affect a PBM's decision to select a particular prescription drug for a particular plan participant" and remove beneficiaries' right to go to state court to enforce any rights under the statute. *Id.* at 5–6. Accordingly, all the reasons for preemption, he argues, are gone.

That is too crabbed a reading of the original decision. It is clear that Judge Woodcock reached a general conclusion that ERISA preempts the UPDPA but, in the interests of time and brevity, chose only examples to demonstrate his conclusion. He specified that his examples were "only the first of a host of issues." I applaud the State for reacting so quickly to the particular problems Judge Woodcock highlighted; perhaps at the end of the case, when final analysis and decision occur, the State will prevail (I make no predictions). But the reasoning and scope of the *preliminary* injunction cannot be so easily avoided. Judge Woodcock's preliminary conclusion that the UPDPA has an "impermissible connection" with ERISA stands. I therefore do not need to revisit his "impermissible reference to ERISA" conclusion.

## B. Takings

 The Legislature made another recent amendment to the statute. The UPDPA has two subsections, 22 M.R.S.A. §§ 2699(2)(D) and (G), requiring PBMs to disclose certain financial information to their clients, information that Judge Woodcock concluded (for purposes of the preliminary injunction ruling) was trade secret information. Judge Woodcock upheld one

of the disclosure requirements, section (2)(D), against attack, in part because it contained a confidentiality component that prevented the client from disclosing the information further. He concluded (preliminarily), however, that the other disclosure requirement, section (2)(G), was an unconstitutional taking. The legislature has now added section (2)(D)'s confidentiality language to the disclosure requirement of section (2)(G). As a result, the Attorney General asks me to vacate Judge Woodcock's preliminary ruling that section (2)(G) was a taking. I decline to do so.

Judge Woodcock's ruling upholding section (2)(D) was based on two factors. First, he assumed that its scope was "limited to information about benefits the covered entity has paid for or services the PBM provided to it" and concluded on that basis alone that it did not violate constitutional requirements. Order Granting Mot. for Prelim. Inj. at 17. The confidentiality provision in section (2)(D) was a "Moreover" to the opinion's reasoning. *Id.* Judge Woodcock then continued: *"To the extent this information is in fact a trade secret,* the statute's protection from further disclosure inoculates it from constitutional infirmity." *Id.* (emphasis added). Obviously there is some doubt whether disclosure to the covered entity of information about benefits it has paid for or about services provided to it could really amount to divulgence of a trade secret.

In the case of section (2)(G), however, the PBM is required to disclose to its clients "all financial terms and arrangements for remuneration of any kind that apply between the pharmacy benefits manager and any prescription drug manufacturer or labeler, including, without limitation, formulary management and drug-switch programs, educational support,

ty of this date, I treat all provisions as effec- tive.

claims processing and pharmacy network fees that are charged from retail pharmacies and data sales fees." 22 M.R.S.A. § 2269(2)(G). According to Judge Woodcock, section (2)(G) presents "a different problem" from section (2)(D) in two ways: "It not only mandates disclosure of information that goes to the heart of what the PBMs contend are trade secrets, but it also fails to protect that information from further disclosure." Order Granting Mot. for Prelim. Inj. at 18. Thus, although Judge Woodcock had been skeptical whether section (2)(D) involved a trade secret at all, he recognized that trade secrets (as the plaintiff sees them) were central to section (2)(G). This is not information about services provided to the client or about benefits paid for. Instead, possession of this information is an important part of a PBM's proprietary information. Unlike section (2)(D), disclosure to the client of this information threatens its value regardless of protection against further disclosure.[2] Again, I applaud the State's quick response to Judge Woodcock's Order, but whatever effect it may have on the final decision, it is not sufficient to justify vacating the preliminary injunction.

## II. SEVERABILITY

Judge Woodcock's preliminary injunction did not discuss whether Maine could enforce those parts of the UPDPA that are not unconstitutional or preempted. This is what lawyers and judges call a "severability" question: Can the unproblematic parts of a statute be saved, or has the court's ruling so gutted the statute that it cannot go into effect at all?

■ Unlike some statutes, the UPDPA has no severability provision specifying the Legislature's intent in the event of partial

invalidity. For such cases, Maine has a general statute. It provides:

> The following rules shall be observed in the construction of statutes, unless such construction is inconsistent with the plain meaning of the enactment.
>
> 8. SEVERABILITY. The provisions of the statutes are severable....If any provision of the statutes...is invalid, or if the application of [it] to any person or circumstance is invalid, such invalidity does not affect other provisions or applications which can be given effect without the invalid provision or application.

1 M.R.S.A. § 71(8) (Supp.2003). The Maine Law Court has stated:

> [P]artial unconstitutionality of a statute or ordinance does not necessarily result in tainting the whole legislation, even in the absence of a severability clause. Where it appears that the valid provisions would have been enacted, even if the invalid portion had been deleted, then the valid part may stand and the invalid may be rejected. On the other hand, when the legislative provisions are so related in substance and object that it is impossible to determine that the legislation would have been enacted except as an entirety, if one portion offends the Constitution, the whole must fall.

*Town of Windham v. LaPointe*, 308 A.2d 286, 292 (1973) (citations omitted). In short, there is a presumption in favor of severability, but the key question is legislative intent. *See Opinion of the Justices*, 2004 Me. 54, ¶ 23, 850 A.2d 1145 (citations omitted) ("[T]he Law Court has explained that if a provision of a statute is invalid, that provision is severable from the remainder of the statute as long as the rest of the statute 'can be given effect' without the invalid provision, and the invalid provision is not such an integral part of the

---

2. Like Judge Woodcock, I make no final ruling on whether this data is a trade secret.

*See* Order Granting Mot. for Prelim. Inj. at 15 n. 15.

statute that the Legislature would only have enacted the statute as a whole. The Law Court considers the legislative purpose or purposes of the statute under consideration when examining questions of severability.").[3]

█ In light of the presumption, the burden ordinarily should fall on the party challenging severability (here, the plaintiff) to demonstrate that the Maine legislature would not have enacted the provision had it known that ERISA would preempt its application in most instances and that even where ERISA does not preempt it, one of the disclosure provisions cannot be enforced. *Cf. Beacon Products Corp. v. Reagan*, 633 F.Supp. 1191, 1196 (D.Mass.1986) (citing *Alaska Airlines, Inc. v. Donovan*, 766 F.2d 1550, 1560 (D.C.Cir.1985)). But there is also a procedural history in this case that puts some burden on the Attorney General. As I pointed out in my Order of May 3, 2004, the Attorney General barely mentioned the severability issue in his legal memorandum on the preliminary injunction. Order on Def.'s Mot. to Amend the Order of Prelim. Inj. at 3 (May 3, 2004) (Docket Item 44). Judge Woodcock obviously did not recognize that the Attorney General was pressing that issue. Indeed, he observed in his opinion that "[a]t oral argument, the State did not disagree with PCMA's contention that the 'vast amount' of the covered individuals the PBMs service in Maine are covered under ERISA plans." Order Granting Mot. for Prelim. Inj. at 28. In this context it is not surprising that Judge Woodcock did not go on to analyze whether the Maine Legislature would have enacted UPDPA had it known that much of it could be preempted. The Attorney General thus has some burden in attempting to revisit the issue now.

█ In fact, nothing in the legislative history sheds any light on this issue. The sponsors were concerned about PBMs in general and the legislative debate demonstrates concern about all facets of their role in Maine's health care and drug pricing environment. *See, e.g.*, Testimony of Senator Treat, Sponsor LD 554 (Mar. 24, 2003) (Ex. H, Docket Item 47); Legis. Rec. House H–871 (2003) (Ex. J, Docket Item 47).[4] The real question is whether the statute "*can* be given effect" without its problematic sections. 1 M.R.S.A. § 71(8) (emphasis added). *See also Opinion of the Justices*, 2004 Me. 54, ¶ 23, 850 A.2d 1145; *Bayside Enters., Inc. v. Maine Agric. Bargaining Bd.*, 513 A.2d 1355, 1360 (Me.1986). I will assume (without deciding) that elimination of the unconstitutional disclosure section will not destroy the underlying purpose of the UPDPA. But the plaintiff has questioned whether "the remaining provisions can function ... absent the invalid" portions that ERISA preempts. *See Opinion of the Justices*, 2004 Me. 54, ¶ 24, 850 A.2d

---

**3.** Although this is an issue of Maine statutory construction, federal caselaw also recognizes such a presumption. *See, e.g., Regan v. Time, Inc.*, 468 U.S. 641, 653, 104 S.Ct. 3262, 82 L.Ed.2d 487 (1984) (stating that "the presumption is in favor of severability"); *Buckley v. Valeo*, 424 U.S. 1, 108, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (citation omitted) ("Unless it is evident that the legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law.").

**4.** The Attorney General recognizes that "[t]he brief legislative debate centered largely on the need for any legislation at all, and whether enactment would save Maine consumers and plans any money." Def.'s Supplemental Mem. in Support of His Mot. to Amend the Order of Prelim. Inj. at 19. There were both references to both ERISA and non-ERISA plans without differentiation.

1145. The UPDPA applies to PBMs. PBMs contract with covered entities. At the time the UPDPA was first enacted, at least some covered entities had both ERISA (*e.g.*, private employers) and non-ERISA (*e.g.*, government entities and individuals) members and subscribers. *See* PCMA's Reply Mem. in Support of Prelim. Inj., Levy Rebuttal Decl., Ex. 2 (Ex. 1, Docket Item 18)[5]; Def.'s Supplemental Mem. in Support of His Mot. to Amend the Order of Prelim. Inj. at 12 (stating that Maine insurance companies sell policies to individuals and governmental entities not subject to ERISA); Schuldes Decl. ¶ 7 (Docket Item 51) (stating that insurance companies have contracts with private employers and governmental entities). How can the UPDPA challenged provisions govern these covered entities or insurance companies without forbiddenly affecting the ERISA plans? The Maine Attorney General's response is that it is "pure conjecture" that some covered entities may provide healthcare benefits to both individuals not covered by ERISA and employers who are. *See* Def.'s Reply Mem. in Support of His Motion to Amend

the Order of Prelim. Inj. at 6 (Docket Item 53). However, there is some record support for the plaintiff's assertion. I also find it unlikely that the Maine Legislature would have intended serendipitous enforcement, depending upon the mix of a particular covered entity's members. For preliminary injunction purposes, the challenged provisions cannot "be given effect" without interfering with ERISA preemption.

Certainly the record before me leaves a lot to be desired on whether enforcement can or cannot occur without interfering with ERISA preemption, and after reading the legal memoranda many times, I am still uncertain exactly how UPDPA enforcement would work, given preemption. One additional factor matters, and that is timing. Ultimately, at the end of the case, severability may turn out to be a persuasive argument for the final decision (if I adhere to the preliminary finding of preemption). But it certainly would disserve procedural justice to divert the lawyers and judge now into a contested evidentiary hearing over how this statute would work, if at all, with parts of it invalidated.[6] Dis-

---

5. The plaintiff points to the Maine Healthcare Purchasing Collaborative as another covered entity that has both ERISA and non-ERISA members. *See* Pl.'s Supplemental Mem. in Opp'n to Def.'s Mot. to Amend Prelim. Inj. at 16 (Docket Item 49). However, the Collaborative may no longer be affected by the UPDPA as a result of the recent amendment limiting the application of UPDPA to contracts entered into after its original effective date. *See* P.L.2003, ch. 688, § C–10.

6. The Attorney General says that no evidentiary hearing is necessary, and that there is no precedent for having an evidentiary hearing on whether portions of the legislation are severable. Def.'s Reply Mem. in Support of Mot. to Amend the Order of Prelim. Inj. at 3 n. 3 (Docket Item 39). That argument makes sense where the issue is legislative purpose divined merely from the words of the statute or perhaps legislative history. Here, howev-

er, the question is whether the rest of the UPDPA can in fact be given effect in the face of ERISA preemption. The answer to that question depends on factual premises. For example, the Attorney General asserts that perhaps 112,891 Mainers in the non-ERISA sector could be helped by the statute. Def.'s Supplemental Mem. in Support of His Mot. to Amend the Order of Prelim. Inj. at 16; Def.'s Reply Mem. in Support of His Motion to Amend the Order of Prelim. Inj. at 6 (Docket Item 53). The plaintiff asserts that the number is 38,000, an "extremely small group by comparison to the almost 690,000 Maine residents who receive private health insurance coverage through employers." Pl.'s Supplemental Mem. in Opp'n to Def.'s Mot. to Amend Prelim. Inj. at 15. Certainly if the Legislature enacted legislation designed to assist 690,000 residents and, by virtue of preemption, the legislation could assist only 38,-000, there is serious question whether the

covery on the merits is to be completed by August 20, 2004 and final summary judgment motions are to be filed by September 17, 2004. All efforts should be focused on reaching that final determination, not on creating delay by skirmishing over temporary relief.[7]

The motion to amend the preliminary injunction is DENIED, without prejudice to renewal of the arguments at the time of final disposition.

So ORDERED.

See, also, 2003 WL 22431931.

legislative purpose would have been to go forward in any event, or whether the ERISA-related aspect was so integral that the Legislature would only have enacted the statute as a whole. *See Opinion of the Justices*, 2004 Me. 54, ¶ 23, 850 A.2d 1145 (citations omitted).

7. A hearing now would be taking place at a time when we do not even know which parts of the UPDPA, if any, will fail to survive. After all, despite the diligent efforts of the lawyers and the lengthy opinion by Judge Woodcock, only a *preliminary* determination has been made so far. A final answer should be available within a few months.