**DIRECTOR OF BUREAU OF LABOR STANDARDS, et al.**

v.

**FORT HALIFAX PACKING COMPANY.**

Supreme Judicial Court of Maine.

Argued Nov. 15, 1985.

Decided June 2, 1986.

James E. Tierney, Atty. Gen., William H. Laubenstein, III, Thomas D. Warren (orally), Asst. Attys. Gen., Augusta, for Director of Bureau of Labor Standards.

Martha E. Geores, Lewiston, for Raymond Bourgoin.

Curtis, Thaxter, Lipez, Stevens, Broder & Micoleau, Sidney St. F. Thaxter, II (orally), Portland, for Fort Halifax Packing.

Perkins, Thompson, Hinckley & Keddy, Linda D. McGill, Richard G. Moon, John H. Rich, III, Portland, for amici curiae, Chamber of Commerce of the U.S. of America and Maine Chamber of Commerce and Industry.

Before McKUSICK, C.J., and NICHOLS, ROBERTS, GLASSMAN and SCOLNIK, JJ.

ROBERTS, Justice.

Fort Halifax Packing Company (hereafter Halifax) appeals from a judgment rendered in the Superior Court, Kennebec County, granting severance pay in varying amounts to over 80 of its employees pursuant to 26 M.R.S.A. § 625–B (Pamph.1985).[1] On appeal Halifax claims that the Maine severance pay statute is preempted by both the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* (1985) (hereafter ERISA) and the National Labor Relations Act, 29 U.S.C. §§ 157 and 158 (1985) (hereafter NLRA). Halifax also raises issues concerning the constitutionality of the severance pay statute, the propriety of the trial justice's denial of a jury trial, the appropriateness of several findings of fact and the necessity of arbitration. Although we modify the trial justice's calculation of severance pay owing to ten employees, we affirm the judgment of the Superior Court in all other respects.

## I. *Facts & Procedural Background*

Halifax began packaging and processing poultry in Winslow in 1972 when it purchased the assets of Ralston Purina, a corporation that had conducted similar operations on the site since 1961. On May 23, 1981 Halifax ceased processing operations at the Winslow plant and laid off all of its workforce except several maintenance men and clerical employees.

At the time of the closing, Halifax had over 100 individuals on the payroll. These employees worked (1) directly in the processing plant, (2) on "live-haul" duty,[2] (3) as

---

1. 26 M.R.S.A. § 625–B (Pamph.1985) provides in part:

 **2. Severance pay.** Any employer who relocates or terminates a covered establishment shall be liable to his employees for severance pay at the rate of one week's pay for each year of employment by the employee in that establishment. The severance pay to eligible employees shall be in addition to any final wage payment to the employee and shall be paid within one regular pay period after the employee's last full day of work, notwithstanding any other provisions of law.

 **3. Mitigation of severance pay liability.** There shall be no liability for severance pay to an eligible employee if:

 **A.** Relocation or termination of a covered establishment is necessitated by a physical calamity;

 **B.** The employee is covered by an express contract providing for severance pay;

 **C.** That employee accepts employment at the new location; or

 **D.** That employee has been employed by the employer for less than 3 years.

2. "Live-haul" duty employees were used by Halifax to travel to various farms to catch, crate and

supervisory or administrative employees, or (4) in one of the Corbett Brothers feed mills.[3] Many of the employees who worked directly in the plant were represented by Local 385 of the Amalgamated Meat Cutters & Butcher Workmen of North America (hereafter Local 385) and had a contract with Fort Halifax. This contract had effective dates from June 2, 1979 to June 2, 1982 and contained no provision for severance pay. In fact, at the time of the closing Halifax had no contract or agreement regarding severance pay that governed any of the employees delineated above.

Following the closing, Halifax met with officials of the State of Maine and union representatives to discuss the possibility of reopening the plant. Specifically in the fall of 1981 Halifax suggested that reopening was possible and sought concessions from Local 385 in the form of amendments to the union contract. The amendments, *inter alia*, sought to add a severance pay provision to the contract that would shield Halifax from severance pay liability for union members under 26 M.R.S.A. § 625–B in the event that the plant reopened. Although Local 385 signed the agreement on November 1, 1981, Halifax never resumed operations before the expiration date of the proposed amendments, June 2, 1984.

Prior to the signing of the amendments, on October 30, 1981 eleven employees of the plant filed suit against Halifax in Superior Court seeking severance pay pursuant to 26 M.R.S.A. § 625–B. A few days later the Director of the Bureau of Labor Stan-

dards also commenced an action to enforce the provisions of Maine's severance pay law as to all Halifax employees pursuant to 26 M.R.S.A. § 625–B(5).[4] At a trial held in the Superior Court without a jury, the trial justice found that Halifax was liable for severance pay and provided a precise computation of the amounts owing to eligible individuals.

## II. *ERISA Preemption*

■ As its first contention on appeal, Halifax in conjunction with amici,[5] argues that it is not liable for severance pay under 26 M.R.S.A. § 625–B because that statute is preempted by ERISA. For the reasons set forth below, we disagree. It is through operation of the supremacy clause of the United States Constitution that federal law preempts conflicting state law. *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 210–211, 6 L.Ed. 23 (1824). A conflict warranting preemption may be direct in that the state regulation obviously contradicts federal regulation, or it may arise from congressional intent, either express or implied, to occupy a particular area. *McDermott v. State of Wisconsin*, 228 U.S. 115, 132–134, 33 S.Ct. 431, 435–436, 57 L.Ed. 754 (1913); *Metropolitan Life Ins. Co. v. Massachusetts*, —— U.S. ——, 105 S.Ct. 2380, 2393, 85 L.Ed.2d 728 (1985) (citing *Malone v. White Motor Corp.*, 435 U.S. 497, 504, 98 S.Ct. 1185, 1189, 55 L.Ed.2d 443 (1978)). Preemption, however, is not a favored concept, and federal regulation will be deemed to be preemptive of state regulatory powers only if grounded in "persuasive reasons—either

---

transport poultry grown by independent farmers for sale to Halifax.

**3.** Corbett Brothers is a subsidiary of Halifax that produced table and hatching eggs as well as broilers. Halifax used this subsidiary, *inter alia*, to raise the poultry necessary for processing.

**4.** 26 M.R.S.A. § 625–B(5) provides in part:

 **5. Suits by the director.** The director is authorized to supervise the payment of the unpaid severance pay owing to any employee under this section. The director may bring an action in any court of competent jurisdiction to recover the amount of any unpaid severance

pay. The right provided by subsection 4 to bring an action by or on behalf of any employee, and of any employee to become a party plaintiff to any such action, shall terminate upon the filing of a complaint by the director in an action under this subsection, unless the action is dismissed without prejudice by the director....

**5.** The Chamber of Commerce of the United States and the Maine Chamber of Commerce and Industry filed an amicus brief pursuant to M.R.Civ.P. 75A(f)(1) in support of Halifax's preemption arguments.

the nature of the regulated subject matter permits no other conclusion or that Congress has unmistakably 'so ordained.'" *Alessi v. Raybestos-Manhattan, Inc.* 451 U.S. 504, 522, 101 S.Ct. 1895, 1905, 68 L.Ed.2d 402 (1981) (quoting *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963)).

■ As the preamble to the Act indicates, ERISA was enacted in 1974 for the purpose of regulating private employee benefit plans established and maintained by employers and employee organizations. 29 U.S.C. § 1001(a) (1985). *See also* Hutchinson & Ifshin, *Federal Preemption of State Law Under the Employee Retirement Income Security Act of 1974*, 46 U.Chi.L. Rev. 23 (1978). Prior to ERISA's passage regulation of privately created employee benefit plans was generally confined to state laws that were not uniquely adapted to protect the participants of such plans. Hutchison, 46 U.Chi.L.Rev. at 25. Growth in size of employee benefit plans and a concomitant increase in loss of benefits by employees compelled Congress to establish uniform disclosure, reporting, vesting and funding standards meant to ensure that employees would not lose benefits in plans created by employers or employee organizations. *See generally* H.R.Rep. No. 533, 93d Cong., 2d Sess. (1973), U.S.Code Cong. & Admin.News 1974, p. 4639. Es-

sentially, ERISA is concerned with regulating two types of privately created employee benefit plans—pension plans that provide for retirement or deferred income (29 U.S.C. § 1002(2)) and welfare benefit plans that provide for medical, sickness, accident and other non-pension fringe benefits (29 U.S.C. § 1002(1)).[6] The Act specifically states that its requirements are meant to cover those plans created by employers and employee organizations. 29 U.S.C. § 1003(a).[7]

With an eye towards making regulation of private employee benefit plans exclusively a federal concern, ERISA also contains an express preemption provision which provides:

> Except as provided in subsection (6) of this section, the provisions of this title and title IV shall supersede any and all state laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title....

29 U.S.C. § 1144. Thus, in this case we must address the question of whether in light of the ERISA's purposes and the existence of an express preemption provision Congress has "unmistakably ... ordained" preemption of Maine's severance pay law.

In *Shaw v. Delta Airlines*, 463 U.S. 85, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983), the Supreme Court gave a rather broad con-

---

**6.** Part one of ERISA covers the reporting and disclosure requirements for both types of plans. The basic purpose of these requirements is to keep employees informed of their rights and to enable the Secretary of Labor to assess the financial soundness of plans. Consequently, under Part one fund administrators must furnish plan participants with a description of the plan and provide a copy of the annual report. Such information must also be supplied to the Secretary of Labor.

Parts two and three of ERISA address pension benefit plans only. These sections establish minimum vesting, participation and funding requirements.

Part four applies to both types of plans and sets the fiduciary standards for plan management. A "prudent man" standard is established for fund administrators and a list of prohibited financial transactions is given.

Part five of ERISA contains the enforcement provisions of the Act. It creates broad criminal and civil penalties and gives the Secretary of Labor investigative powers and authority to promulgate regulations.

**7.** Title 29 U.S.C. ¶ 1003(a) provides in part:

(a) ... [T]his subchapter shall apply to any employee benefit plan if it is established or maintained—

(1) by any employer engaged in commerce or in any industry or activity affecting commerce; or

(2) by any employee organization or organizations representing employees engaged in commerce or in any industry or activity affecting commerce; or

(3) by both.

struction to the "relate to" language in ERISA's preemption provision. In *Shaw* the Court held that Section 1144 not only preempts state laws dealing with the subject matters covered by ERISA, e.g. reporting, disclosure, and fiduciary responsibility, but also those state laws that have "a connection with or reference to" employee benefits plans covered by the statute. *Id.* at 97, 98. Inasmuch as Maine's severance pay law does not attempt to regulate the reporting, disclosure, and fiduciary subjects covered by ERISA, our statute will be preempted only if it can be said to have "a connection with or reference to" employee benefit plans that are within ERISA's coverage.

■ Our inquiry in this regard is made simple by the fact that the Maine severance pay statute does not affect employee benefit plans that are within ERISA's regulatory reach. Title 29 U.S.C. §§ 1003(a) and 1002(1) make it clear that the employee benefit plans intended for coverage under ERISA are those created by employers or employee organizations. Thus, the preemptive effect of section 1144 is on those State laws that affect plans created by either of these private parties.[8] In this case the severance pay liability created by Section 625–B is not a plan created by an employer or employee organization. Instead, it is a state created fringe benefit passed within the police power for the purpose of dealing with the economic dislocation that accompanies the shut-down of large establishments. Inasmuch as Section 625–B does not implicate a plan created by

an employer or employee organization, it cannot be said to be preempted by ERISA.

Moreover, Section 625–B contains an explicit provision that totally eliminates state regulation if a plan covering severance pay *is created* by an employer or employee organization. Specifically, Section 625–B(3)(B) provides: "There shall be no liability for severance pay to an eligible employee if: ... [t]he employee is covered by an express contract providing for severance pay,...." Such a contractual arrangement presumably would constitute a plan created by an employer or employee organization for purposes of ERISA. It would be subject to the full panoply of requirements created in that statute and would then be immune from state regulation. Because Maine's severance pay statute is operative only when a privately created employee benefit plan covering severance pay is not in existence, it does not have a "connection with or reference to" an employee benefit plan covered by ERISA and is thus not preempted by Section 1144.[9]

### III. *NLRA Preemption*

■ Unlike ERISA, the NLRA does not contain an explicit preemption provision. As a result, the NLRA's preemptive effect must be discerned by implication from the policies of the act. *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977). Halifax and amici argue that because the Maine severance pay statute mandates the substantive terms of its collective bargaining agree-

---

8. Consequently, those state laws that have been held by the Supreme Court to be preempted implicate plans that have been created by employer or employee organizations. In *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 101 S.Ct. 1895, 68 L.Ed.2d 402 (1981) a New Jersey state law was held to be preempted because it eliminated a method for calculating pension benefits in a privately created plan that was permitted by ERISA. The statute implicated in *Alessi* was the New Jersey Workers' Compensation Act, which prohibited employers from reducing a retiree's pension benefits by an amount equal to the workers' compensation award for which the retiree was eligible. The

Supreme Court held that ERISA leaves to the private parties who create the pension plan the determination of the amount of benefits that, once vested, cannot be forfeited. Since the parties in *Alessi* agreed on the offset, the Court held that the New Jersey law was preempted insofar as it eliminated this method of calculating pension benefits.

9. We need not decide whether the "express contract" exclusion of section 625–B(3)(B) must necessarily reach every informal plan meeting the ERISA definition. *See Gilbert v. Burlington Industries, Inc.*, 765 F.2d 320 (2d Cir.1985).

ment, this state statute is preempted by the NLRA.

The NLRA was enacted in 1935 for the purpose of addressing industrial strife by encouraging collective bargaining. 29 U.S.C. § 151. Aimed at redressing "the inequality of bargaining power between employees who do not possess full freedom of association or actual liberty of contract and employers who are organized in the corporate association," the NLRA's goal was to restore equality of bargaining power in the hope that depressed wage rates would thereby be resolved. 29 U.S.C. § 151. The act protects employees' rights to organize and to engage in concerted action in Section 7 and defines unfair labor practices by employers and labor organization in Section 8. 29 U.S.C. §§ 157, 159. As the Supreme Court noted in *Metropolitan Life Insurance Co. v. Massachusetts,* —— U.S. ——, 105 S.Ct. 2380, 2396, 85 L.Ed.2d 728 (1985), "The NLRA is concerned primarily with establishing an equitable *process* for determining terms and conditions of employment, and not with particular substantive terms of the bargain that is struck when the parties are negotiating from relatively equal positions." (Emphasis added.)

Grounding its decisions in the policies of the NLRA, the Supreme Court has discerned two different principles of preemption that flow from the act. The first is based on implied congressional intent to leave certain conduct that is neither protected nor prohibited by either Section 7 or 8 of the act unrestricted from most forms of regulation by either the NLRB or the states. *Teamsters Local 20 v. Morton,* 377

U.S. 252, 84 S.Ct. 1253, 12 L.Ed.2d 280 (1964); *Machinists v. Wisconsin Employment Relations Comm'n,* 427 U.S. 132, 140, 96 S.Ct. 2548, 2553, 49 L.Ed.2d 396 (1976). Cases dealing with this type of preemption ... "rely on the understanding that in providing in the NLRA a framework for self-organization and collective bargaining, Congress determined both how much the conduct of unions and employers should be regulated and how much should be left ..." to the free play of economic forces. *Metropolitan Life,* 105 S.Ct. at 2395.

■ Despite the seeming broad range of this branch of NLRA preemption, state laws of general application that impose minimal substantive requirements on contract terms are not preempted.[10] As the Supreme Court noted in *Metropolitan Life:*

> Most significantly, there is no suggestion in the legislative history of the Act that Congress intended to disturb the myriad of state laws then in existence that set minimum labor standards, but were unrelated in any way to the processes of bargaining or self-organization. To the contrary, we believe that Congress developed the framework for self-organization and collective bargaining of the NLRA within the larger body of state law promoting public health and safety. The states traditionally have had great latitude under their police powers to legislate as " 'to the protection of lives, limbs, health, comfort and quiet of all persons.' " *Slaughter-House Cases,* 16 Wall. 36, 62 [21 L.Ed. 394] (1873) quoting *Thorpe v. Rutland & Burlington R. Co.,* 27 Vt. 140, 149 (1855). "States possess

---

**10.** Those state laws that have been held by the Supreme Court to be preempted invariably involve attempts by the state to regulate employer or employee conduct and control the collective bargaining process. Thus, in *Teamsters Local 20 v. Morton,* 377 U.S. 252, 84 S.Ct. 1253, 12 L.Ed.2d 280 (1964), the Court struck down an Ohio law that prohibited a type of secondary boycott and ruled that if the state law were allowed to deprive the union of this self-help weapon "the inevitable result would be to frustrate the congressional determination to leave

this weapon of self-help available and to upset the balance of power between labor and management expressed in our national labor policy." *Id.* at 260. Similarly, in *Machinists v. Wisconsin Employment Relations Comm'n,* 427 U.S. 132, 96 S.Ct. 2548, 49 L.Ed. 396 (1976), the Court overruled a state law that penalized a concerted refusal to work overtime and held that this conduct by organized employees was intended to be unregulated as a self-help mechanism.

broad authority under their police powers to regulate the employment relationship to protect workers within the State. Child labor laws, minimum and other wage laws, laws affecting occupational health and safety ... are only a few examples." *DeCanas v. Bica,* 424 U.S. 351, 356 [96 S.Ct. 933, 936, 47 L.Ed.2d 43] (1976). State laws requiring that employers contribute to unemployment and workmen's compensation funds, laws prescribing mandatory state holidays and those dictating payment to employees for time spent at the polls or on jury duty all have withstood scrutiny. *See e.g., Day-Brite Lighting, Inc. v. Missouri,* 342 U.S. 421, 72 S.Ct. 405, 96 L.Ed. 469 (1952).

*Id.* 105 S.Ct. at 2398.

 Maine's severance pay law is a statute of general application that affects union and nonunion employees equally. Designed to protect Maine citizens from the economic dislocation that accompanies closing of large establishments, the severance pay statute is a legitimate exercise of the state's police power. *Shapiro Bros. Shoe Co., Inc. v. Lewiston Auburn S.P.A.,* 320 A.2d 247, 254 (Me.1974); *State v. Union Oil Co of Maine,* 151 Me. 438, 120 A.2d 708 (1956). The statute, in fact, has a very limited impact on the collective bargaining process inasmuch as it does not ever apply when the parties have reached an agreement on the subject of severance pay via an express contract. Although Section 625–B does affect the collective bargaining relationship by encouraging employers to either agree to some form of severance pay contract or face liability under the act, it does not limit the rights of self-organization or forms of collective bargaining protected by the NLRA and is not preempted by the act.

The second line of preemption that can be discerned from Supreme Court cases interpreting the NLRA protects the primary jurisdiction of the NLRB to determine what kind of conduct is either prohibited or protected by the NLRA and was most thoroughly explored in *San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). Under the *Garmon* rule, preemption of a state law must occur

> when it is clear or may fairly be assumed that the activities which a state purports to regulate are protected by § 7 of the National Labor Relations Act, or constitute an unfair labor practice under § 8, ....

*Id.* at 244, 79 S.Ct. at 779. *Garmon* preemption accomplishes Congress's purpose of creating an administrative agency in charge of creating detailed rules to implement the act, rather than having the act enforced and interpreted by the state or federal courts.

As a result, state statutes that have been held to be preempted under *Garmon* involve state action that attempts to directly regulate conduct protected under Section 7 or prohibited under Section 8. Thus, in *Amalgamated Association of Street, Electric Railway & Motor Coach Employees of America v. Lockridge,* 403 U.S. 274, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971) the Supreme Court held that a state court did not have jurisdiction of a claim filed against a union by an employee who was fired for failure to pay union dues because the union's conduct was covered by either Section 7 or 8 and thus subject to the jurisdiction of the NLRB.

Conversely, other Supreme Court cases denying preemption often recognize the importance of the state interest involved and uphold the state activity. In *Farmer v. United Brotherhood of Carpenters & Joiners of America,* 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977), the Court held that the NLRA did not preempt the state tort action for intentional infliction of emotional distress arising in connection with a claim of employment discrimination by the union because the state had a substantial interest in protecting its citizens from the outrageous conduct alleged.

 Halifax and amici contend that the Maine severance pay law regulates con-

duct protected by the NLRA by (1) imposing a different resolution to a bargaining impasse than is required by Section 8(d)[11] and (2) interfering with the employer's right under section 7 to implement its last best offer unilaterally. Despite Halifax's attempt to characterize the severance pay statute as interfering with these employer rights and thus with the jurisdiction of the NLRB, its arguments on this score simply amount to a restatement of the position that Maine may not employ its police power to enact a law of general application that has an effect on the collective bargaining process. As such, Halifax's contentions do not even implicate *Garmon*-type preemption. Moreover, even if we were to decide that Section 625–B does interfere with the jurisdiction of the NLRB, the statute would be saved from preemption under the reasoning of *Farmer* set out above because it reflects the state's substantial interest in protecting Maine citizens from the economic dislocation that accompanies large-scale plant closings.

### IV. *Constitutional Challenge*

 Halifax also contends that the application of section 625–B in these circumstances will result in an unconstitutional impairment of contractual obligations and the imposition of liability without due process. Halifax apparently considers that the impact of the statute will impair the agreement between Halifax and its predecessor as well as the agreement between Halifax and its employees. First, Halifax has not identified any obligation between itself and its predecessor that will be impaired by the statute's operation. Second, the collective bargaining agreement governing Halifax's employees was executed in 1979, almost four years after the effective date of the statute. We have previous-

ly observed that "the law in effect at the time of the execution of a contract becomes part of that contract." *Portland Savings Bank v. Landry*, 372 A.2d 573, 575 (Me. 1977).

Halifax relies principally upon the decision of the Supreme Court in *Allied Structural Steel v. Spannaus*, 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978). Halifax asserts that the facts in *Allied Structural Steel* were remarkably similar to the facts in the case at bar. That assertion overlooks the fact that the Minnesota statute struck down in *Allied Structural Steel* was applied to a preexisting contract and may even have been aimed at a particular employer. *See Energy Reserves Group v. Kansas Power and Light Co.*, 459 U.S. 400, 412, 103 S.Ct. 697, 704, 74 L.Ed.2d 569 n. 13 (1983). A careful reading of *Allied Structural Steel* reveals the significance of the temporal application of the Minnesota statute. The Court stated that a basic term of the contract was substantially modified retroactively and described the effect as a severe disruption of contractual obligations. *Allied Structural Steel*, 438 U.S. at 246, 47, 98 S.Ct. at 2723. Halifax, on the other hand, entered into its 1979 labor agreement with the severance pay statute already on the books. Thus, Halifax fails to get across the threshold inquiry of whether the state law has operated to impair substantially a contractual relationship. *Energy Reserves*, 459 U.S. at 411, 103 S.Ct. at 704.

 Finally, Halifax claims that the inclusion of pre-1975 periods of employment in the computation of severance pay constitutes an unconstitutional retroactive application of section 625–B. The Supreme Court has stated that a "statute is not

---

**11.** Section 8(d) provides in part:

(d) For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotia-

tion of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal *or require the making of a concession.*...
(Emphasis added.)

retroactive merely because it draws upon antecedent facts for its operation." *Lewis v. Fidelity & Deposit Co. of Maryland,* 292 U.S. 559, 571, 54 S.Ct. 848, 853, 78 L.Ed. 1425 (1934). The operative events in the application of the severance pay statute are the relocation or termination of a covered establishment rather than the previous periods of employment. *Cf. Adams v. Buffalo Forge Co.,* 443 A.2d 932, 941–42 (Me. 1982) (application of strict liability statute to products sold prior to the effective date of the act). The severance pay statute does not violate due process even though the legislation imposes liability based in part on past acts. *See Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 16, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976).

## V. *Denial of Jury Trial*

Halifax also argues that it was improperly denied a jury trial by the Superior Court. Article I, Section 20 of the Maine Constitution provides in part:

> In all civil suits, and in all controversies concerning property, the parties shall have a right to trial by jury, except in cases where it has heretofore been otherwise practiced....

In *State v. Anton,* 463 A.2d 703, 708 (Me. 1983), we held that this provision of the Maine Constitution preserves the right to a jury trial in civil actions *where that right existed when the Maine Constitution was adopted.* Specifically, in *Anton* the Court noted:

> When a new type of statutory action is created, the existence of a constitutional right to jury trial under article I, section 20 depends on the nature of the action. (Citation omitted.) If it is a kind that was heard and determined by a common law court with a right to jury trial prior to adoption of the Maine Constitution, then article I, section 20 guarantees that right today.

*Id.* at 709.

■ Thus, Article I, Section 20 does not apply to suits in equity or to civil proceedings not tried by jury in the common law courts. *Id.* at 708. Although Halifax attempts to characterize the present action as an "employment contract dispute," it is, instead, an action to recover severance pay under 26 M.R.S.A. § 625–B. Inasmuch as Maine's severance pay statute creates a new cause of action unknown to the common law, no right to a jury trial existed for proceedings of this nature at the time the Maine Constitution was adopted. As a result, the trial justice correctly denied Halifax's request for a trial by jury.

## VI. *Findings of Fact*

■ Although Halifax questions several factual findings made by the Superior Court, we determine that the court committed clear error only in its calculation of severance pay for 10 of the employees held to be eligible under Section 625–B. Halifax contends that one month's severance pay was already disbursed to these 10 individuals and that this payment should have been subtracted from the final figure calculated by the Superior Court. We agree.

Pursuant to a March 28, 1985 Superior Court order, the parties to this action submitted a list of all Halifax employees and provided information regarding disputed severance pay. As part of complying with this order Halifax and the State agreed as follows:

> The parties agree that vacation pay (column VII of Attachment A) and severance pay (column VIII) must be subtracted from gross pay before obtaining the correct weekly average wage which is set forth in column XI.

The list submitted discloses that column VIII contains a severance pay figure for 10 individuals. By agreeing that this figure termed "severance pay" should be subtracted from the "gross pay" column before average weekly wage is determined, the State, in effect, has admitted that these 10 employees were already paid one week's severance pay by Halifax. As a result, the Superior Court's calculation of severance pay for these 10 employees must be altered by subtracting the amount listed in column

VIII from the gross severance pay due these employees.

## VII. *"Live-Haul" Employees*

Halifax also challenges the Superior Court's legal conclusion that the "live-haul" employees were employed by a "covered establishment" for the purpose of Section 625–B. It is Halifax's contention that the "covered establishment" phrase applies only to those who work physically within a plant. As a result, Halifax seeks to have this Court reverse the trial justice with respect to his award of severance pay to "live-haul" employees.

As was discussed above, Section 625–B requires that employers who terminate a "covered establishment" pay severance benefits to their employees. The term "covered establishment" moreover, is defined by the Act as "any industrial or commercial facility or part thereof which employs or has employed at any time in the preceding 12–month period 100 or more persons." 26 M.R.S.A. § 625–B(1)(A).

■■■ The Halifax packaging and processing plant in Winslow fits squarely within the definition of "covered establishment" delineated above. The "live-haul" employees, moreover, were employed by this facility. Although most of their activity occurred outside the physical space of the plant, the following facts support the trial justice's ultimate conclusion that they were employees of a "covered establishment" for purposes of the Act: (1) the men were paid by Halifax, (2) their jobs were essential to Halifax's poultry processing operations, (3) "live-haulers" reported to the plant and were supervised by Halifax foremen, (4) these employees were rendered unemployed by the closing. As a result, the Superior Court's award of severance pay to the "live-haul" employees must be sustained.

## VIII. *Necessity of Arbitration*

As its final issue on appeal, the employer argues that questions concerning liability for severance pay should have been first submitted to arbitration in light of the mandatory arbitration provision in the collective bargaining agreement with Local 385. We disagree.

■■■ Article IV, Section 5 of the collective bargaining agreement in existence between Halifax and Local 385 does provide for arbitration when "grievances arise concerning the interpretation or application of the terms" of the contract. However, the claim for severance pay that is the subject of this suit does not arise out of the contract. In the first place, the State is the central party bringing this action under Section 625–B for all Halifax employees, union and non-union alike. Second, the contract in existence between Halifax and Local 385 at the time of the closing did not address severance pay. Consequently, resort directly to the courts by the Director of the Bureau of Labor Standards was appropriate.

The entry is:

Judgment modified in accordance with the opinion herein to subtract severance pay already paid, and as so modified, affirmed.