**DIRECTOR OF BUREAU OF LABOR STANDARDS, et al.**

v.

**DIAMOND BRANDS, INC.**

Supreme Judicial Court of Maine.

Argued Jan. 16, 1991.
Decided March 27, 1991.

Peter J. Brann (orally) and Linda Conti, Dept. of the Atty. Gen., Augusta, for plaintiffs.

Thomas H. Somers, Richard G. Moon (orally), and Timothy J. O'Brien, Moon, Moss & McGill, Portland, for defendants.

Before McKUSICK, C.J., and ROBERTS, GLASSMAN, CLIFFORD and COLLINS, JJ.

GLASSMAN, Justice.

The plaintiffs, the Director of the Bureau of Labor Standards and the State of Maine, appeal from a summary judgment entered by the Superior Court (Kennebec County, *Chandler, J.*) for the defendant, Diamond Brands, Inc. (Diamond Brands), on the plaintiffs' claim to recover severance pay on behalf of the defendant's former employees pursuant to 26 M.R.S.A. § 625–B (1988 & Supp.1990).[1] The plaintiffs contend that the court erred as a matter of law in its determination that Diamond Brands was exempt from liability for severance pay under the statute because it had not been an "employer" for three years. *See* 26 M.R.S.A. § 625–B(3)(D), (1)(C). We agree with the court's interpretation of the statute and affirm the judgment.

In March 1983, Diamond Match Company (Diamond Match), a business incorporated under the laws of Delaware, purchased the assets of the Diamond Match Division of Jefferson Smurfit Corporation, a company that manufactured various paper products at plants in Dixfield and Oakland. After the purchase, Diamond Match continued the operation of these plants until May 1985, when it closed the Oakland plant and made "salary continuation" payments to the terminated employees pursuant to the union agreement.

On July 28, 1986, the defendant, Diamond Brands, was incorporated in Minnesota. On October 1, 1986, pursuant to an agreement drafted under the laws of Minnesota, Diamond Brands purchased the assets of Diamond Match,[2] assumed its current union contract, and credited existing employees for their accumulated seniority with Diamond Match. The purchase agreement specifically disclaimed Diamond Brands's liability for any severance pay owed to the employees by Diamond Match. Diamond Brands continued to employ the same management personnel and market its paper products to former customers of Diamond Match. Diamond Brands continued operations for approximately two years before closing the Dixfield plant.[3]

The State of Maine and the Director of the Department of Labor Standards filed the current action in the Superior Court against Diamond Brands to recover severance pay for the company's terminated employees, pursuant to 26 M.R.S.A.

---

1. Section 625–B provides in pertinent part:
 1.....
 C. "Employer" means any person who directly or indirectly owns and operates a covered establishment.
 D. "Person" means any individual, group of individuals, partnership, corporation, association or any other entity.
 2. **Severance pay.** Any employer who relocates or terminates a covered establishment shall be liable to his employees for severance pay at the rate of one week's pay for each year of employment by the employee in that establishment....
 3. **Mitigation of severance pay liability.** There shall be no liability for severance pay to an eligible employee if:
 ....
 D. That employee has been employed by the employer for less than 3 years.

2. Diamond Brands issued and transferred approximately 43,500 shares of Diamond Brands stock, with a value of $4.3 million, to Diamond Match as part of the total consideration of $14 million.

3. After continued financial losses and a failure to obtain wage concessions from the union in subsequent collective bargaining, the board of directors of Diamond Brands began in March 1987 to discuss the possibility of moving some of the corporation's operations out of Maine. On March 31, 1987, the Dixfield plant sustained major flood damage of approximately $850,000. Six months later, Diamond Brands announced to its employees that it would be moving some of its operating divisions to Mexico in an effort to save labor costs, and the move was completed within eight months. On September 20, 1988, within two years after its purchase of Diamond Match's assets, Diamond Brands closed the Dixfield plant, and as a result, approximately 200 of its employees lost their jobs.

§ 625–B(5) (1988) and 5 M.R.S.A. § 191 (1989 & Supp.1990). Diamond Brands filed a motion for a summary judgment based on its contention that, because it had employed the workers at the Dixfield plant for less than two years, it was exempt from liability for severance pay under section 625–B(3)(D), which provides that "[t]here shall be no liability for severance pay liability if ... [t]hat employee has been employed *by the employer* for less than 3 years." (emphasis added). The plaintiffs filed a cross-motion for a summary judgment based on their contention that a successor in interest is an "indirect" owner and operator within the statutory definition of "employer." Accordingly, they argued, the three-year statutory exemption is not available to an employer of employees who have been continuously employed by both the transferor and transferee corporations for a combined period in excess of three years. After a hearing, the court granted Diamond Brands's motion for a summary judgment on the ground that the plain language of subsection (3)(D) exempted Diamond Brands from liability for severance pay to its employees, and the plaintiffs appeal.[4]

Section 625–B(2) generally imposes liability for severance pay on any employer who closes a plant in Maine, but further provides that no such liability will arise if the employer has employed the terminated employees for less than three years. *Id.* at § 625–B(3)(D). The statute specifically defines the term "employer" as a person who directly or "indirectly" owned and operated the closed plant. *Id.* at § 625–B(1)(C). The plaintiffs argue in effect that Diamond Brands "indirectly" owned the Dixfield plant for a period prior to its acquisition of the plant on October 1, 1986. We reject any interpretation of the severance pay statute that would support such a finding on the present undisputed facts.

 Unless a statute as a whole discloses a contrary intention, unambiguous language should be afforded its plain meaning. *See Stanley v. Tilcon Maine, Inc.*, 541 A.2d 951, 952 (Me.1988). Further, absent a contrary agreement by the parties, or an explicit statutory provision in derogation of the established common law rule, a corporation that purchases the assets of another corporation in a *bona fide*, arm's-length transaction is not liable for the debts or liabilities of the transferor corporation.[5] *See Whiting v. Malden & Melrose R.R.*, 202 Mass. 298, 304, 88 N.E. 907, 910 (1909); 8 Z. Cavitch, *Business Organizations* § 163.02(2)(c) (1990); 15 W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 7122 (1990) (and cases cited therein).

 The plaintiffs' contention that a successor corporation is an "indirect" owner and operator would require us to impose an unusual and strained meaning on the plain language of section 625–B(1)(C), both in terms of its ordinary usage and in terms of its standard definition in other legal contexts.[6] The use of the term "indirect" in

4. Diamond Brands filed, but did not pursue, a cross-appeal challenging the constitutionality of the severance pay statute.

5. Although the plaintiffs argue that Diamond Brands was a mere continuation of Diamond Match, they generated no genuine issue of material fact regarding the nature of the asset purchase between the two corporations. In granting the summary judgment in favor of Diamond Brands, the court implicitly determined, based on the plaintiffs' failure to produce evidence that the transaction was undertaken for an improper purpose or with the fraudulent intent to deprive the workers of their remedy under the severance pay statute, that the two companies were distinct corporate entities. *See Brennan v. Saco Constr., Inc.*, 381 A.2d 656, 662 (Me.1978) (absent fraud, misrepresentation, or intent to circumvent overriding public policy, court reluctant to disregard corporation form).

6. We have previously held that the statutory definition of "employer" could not include the ownership interest of a parent corporation. *See Curtis v. Lehigh Footwear, Inc.*, 516 A.2d 558, 560 (Me.1986). The *Curtis* decision was not based on the fact that the statutory definition necessarily excluded parent corporations from its plain language, but that the statutory language was too imprecise to effect a derogation of the common law principle that the shareholders of a corporation enjoy limited liability for the debts of the corporation. In 1989, the Legislature amended the definition of "employer" to provide that "a parent corporation is considered the indirect owner and operator of any covered establishment that is directly owned and operat-

the current statutory language will not suffice as an explicit derogation of the general common law rule that limits the liability of successor corporations for the debts of their transferors. Therefore, while Diamond Brands "directly" owned and operated the Dixfield plant, it had done so for less than the three years necessary to trigger any obligation under section 625–B(2).

Although the plain language of the statute obviates our resort to extrinsic aids to statutory construction, we note that, contrary to the contentions of the plaintiffs, the various amendments to the severance pay statute since 1971 and their legislative history independently support our interpretation. As originally amended in 1971, the severance pay statute imposed liability on any "person, firm or corporation" that closed a covered establishment without a 30–day notice, but also provided that no liability would be imposed if an employee had "worked for less than one year *for the employer.*" P.L.1971, ch. 452 (emphasis added). Under this version of the statute, successor corporations that had operated a Maine plant for less than one year would not be liable for severance pay. *See id.*

In 1973, the statute was amended to impose liability on any "person, firm or corporation ... or [its] *successors in interest,*" and provided that no liability would be imposed if an employee had been "employed for less than 5 years at said *establishment.*" P.L.1973, ch. 545 (emphasis added). The reference to establishment in the exemption provision ties liability to the period of time served by the employee at a particular site, rather than to the identity of the employer. Under this version of the statute, successor corporations, including Diamond Brands, would have been liable for severance pay, regardless of the length of time between the purchase of the corporate assets and the date of the plant closure, and regardless of the number of predecessors in interest in their chain of title.

In 1975, the statute was amended to impose liability on "any employer who ... terminates a covered establishment" but provided, in a separate section specifically entitled *"[m]itigation* of severance pay liability," that no liability would be imposed if an employee has been "employed *by said employer* for less than 3 years." P.L.1975, ch. 512 (emphasis added). The amendment passed without legislative debate. The plaintiffs argue that these changes in the statute in 1975 were in the nature of a mere clarification and were not intended as substantive alterations to the 1973 version of the statute. We cannot agree with the plaintiffs' characterization of the 1975 amendments.[7] In other statutes, the Legislature has explicitly included successors in interest within the definition of the term "employer." *See* 26 M.R.S.A. § 1043(9) (1988 & Supp.1990) (definition of "employer" under unemployment compensation statute). The deletion of the phrase "successor in interest" from the language of the 1975 amendment to the severance pay statute evidences a deliberate return to the more limited remedy provided by the 1971 statute, which did not include short-term successor corporations within the class of defendants liable for severance pay, and which avoided the broader term "establishment" in defining the mitigation of liability for short-term employees.

The entry is:

Judgment affirmed.

All concurring.

---

ed by its corporate subsidiary." P.L.1989, ch. 667, § 1.

7. In legislative debate on the earlier amendments to the severance pay statute, concerns were raised that the statute could have the unwanted effect of discouraging out-of-state corporations from purchasing Maine companies that were in financial decline. *See* 2 Legis.Rec. 3551 (1971). As in the present case, such purchases would often result in a postponement, if not a complete avoidance, of the ill effects of a plant closure. By the asset purchase from Diamond Match, the employees of Diamond Brands benefited from two additional years of wages and benefits that they might not otherwise have received if Diamond Match had closed the Dixfield plant in 1986.