STATE OF MAINE
YORK, SS.

SUPERIOR COURT
Civil Action
Docket No. CV-16-240

ROBERT WRIGHT, et al.,

    Plaintiffs,

v.

**ORDER**

CUMBERLAND COUNTY RECREATION
DISTRICT D/B/A THE CROSS INSURANCE
ARENA AND CUMBERLAND COUNTY,

    Defendants.

Defendant Cumberland County Recreation d/b/a the Cross Insurance Arena ("CCRD") moves to dismiss plaintiffs' complaint, brought on behalf of themselves and all similarly situated individiuals, for failure to state a claim. CCRD argues that plaintiffs are not entitled to the severance payments they seek under the Maine Severance Pay Act ("MSPA" or the "Act") because they do not—and cannot—allege that CCRD ceased operations at the Cross Insurance Arena (the "Arena"). The present motion turns on the determination of whether severance payments are triggered by the cessation of operations by a particular employer *or* the cessation of operations at a covered establishment. Because the court determines that severance payments are triggered by the cessation of operations at a covered establishment, the court grants the motion to dismiss.[1]

I.    **Facts**

Plaintiffs bring the present action for unpaid severance payments pursuant to 26 M.R.S. § 625-B on behalf of themselves and others similarly situated. (Compl. ¶ 12.)

---

[1] The court, therefore, need not and does not address plaintiffs' motion for class certification or CCRD's motion to stay class certification.

1

Plaintiffs seeks to represent a class consisting of all non-union employees formerly employed by CCRD who had been employed continuously for three years or more prior to their termination on or about March 8, 2015. (*Id.* ¶ 13.) There are a total of approximately 121 non-union employees who fit the above description. (*Id.*)

At all relevant times, CCRD and Cumberland County owned and operated a facility formerly known as the Cumberland County Civic Center and now called the Cross Insurance Arena. (Compl. ¶¶ 23-24.) CCRD is a quasi-governmental entity organized under the laws of Maine. (*Id.* ¶ 10.)

The Arena employed 100 or more people until it ceased commercial operations effective March 8, 2015. (*Id.* ¶¶ 25-27.) CCRD terminated the employment of all members of the purported class by letter dated February 25, 2015. (*Id.* ¶ 28.) After CCRD ceased operation of the Arena, it retained ownership of the facility, but contracted with Global Spectrum ("Spectra") to manage and operate the facility. (*Id.* ¶ 30.) As of March 9, 2015, Spectra became the sole employer of any personnel employed at the Arena. (*Id.*)

The Contract between CCRD and Spectra provides,[2] in pertinent part, "It is acknowledged by the parties that this Agreement is not a lease. [CCRD] will at all times retain Ownership of the Facility, including but not limited to real estate, technical equipment, furniture, displays, fixtures and similar property...." (Attachment 2 to Mot. Dismiss, March 9, 2015 Contract (hereinafter, the "Contract").) CCRD's budget is governed by a public warrant process on an annual basis per law, and the Contract obligates Spectra to abide by CCRD's Operating Budget. (*Id.* at 16.) Revenue from ticket sales and other

---

[2] Although the contract between CCRD and Spectra is outside the pleadings, the court considers it because it is central to the plaintiffs' claim, referenced in the complaint, and plaintiffs do not object to its consideration. *See e.g. Moody v. State Liquor & Lottery Comm'n*, 2004 ME 20, ¶¶ 8-10, 843 A.2d 43.

2

events are deposited into CCRD's Operating Account, and Spectra uses funds from the Operating account to pay "all items of expense for the operation, maintenance, supervision and management of the Facility." (*Id.* at 17.) Additionally, the Contract provides:

> All Facility staff and other personnel shall be engaged or hired by [Spectra], and shall be employees, agents or independent contractors of [Spectra] (or an Affiliate thereof,) and not of [CCRD]. With respect to any current Facility staff and personnel as of the date of this Agreement, [Spectra] will recognize and use the tenure of such staff and personnel for the purpose of calculating vacation time and sick time to be earned under [Spectra's] employee manual....[Spectra] agrees to offer full time employment to current full-time Facility employees as of the Effective Date of this Agreement [March 9, 2015] and further agrees to retain such employees who have accepted [Spectra's] offer of employment on its roster for a period of six (6) months, except that [Spectra] may terminate any such employee for cause at any time, and [Spectra] may further terminate any such employee for any reason other than for cause during that six (6) month period, provided that [Spectra] agrees to pay any such employee who had been employed by [CCRD] for three (3) or more years, as an Operating Expense, severance pay at a rate of one week's pay (defined herein as $1/52^{nd}$ of the employees total base wages in 2014) for every full year such employee was previously employed by [CCRD].

(*Id.* at 13, § 6.1.)

All members of the class who wanted to work for Spectra were required to apply for employment after CCRD terminated their employment and contracted with Spectra to manage and operate the Arena. (Compl. ¶ 31.) Spectra hired many, but not all of the class members who formerly worked at the Arena and who applied for work with Spectra. (*Id.* ¶ 32.) Class members received their last paychecks from the Arena on or about March 13, 2015, for all hours worked through March 8, 2015. (*Id.* ¶ 33.) As of March 8, 2015, class members' eligibility for benefits received through their employment with CCRD ceased, including their rights to the CCRD health insurance, dental insurance, and participation in the CCRD 457 and 401(K) plans. (*Id.* ¶ 34.) Class members who had taken out loans from CCRD's 457 plan were required to repay those loans upon or soon after the termination of

3

their employment on or about March 8, 2015. (*Id.* ¶ 35.)

The terms and conditions of employment for employees hired by Spectra to work at the Arena were different than those under CCRD including that class members:

1) No longer enjoy just cause protection from discipline or discharge, a right they were guaranteed by law as employees of the CCRD'
2) Had to give up or forego outside employment that never previously was considered to conflict with CCRD duties;
3) Receive five fewer paid holidays (8 rather than 13);
4) Are paid biweekly rather than weekly;
5) Pay considerably more for health insurance, particularly for family coverage;[3]
6) Are no longer able to participate in the CCRD's 457 or 401(K) plans and are covered under a new Spectra 401(K) plan only after a 90-day waiting period;
7) May no longer take "comp" time in compensation for excess hours worked during peak work periods;
8) Work in different job titles than they held previously, perform substantially different duties for Spectra, or both;
9) Perform new duties with essentially no training from Spectra and when hired received little to no communication from Spectra about its expectations;
10) If salaried were required to undergo a drug test and criminal background check, if hourly, depending on number of hours worked, were also required to undergo a drug test and criminal background check; and
11) In at least some positions, are required to work significantly more hours than previously and, in some instances, are treated as hourly employees even though previously treated as salaried.

*(Id.* ¶ 36.)

Plaintiffs seek to hold defendant Cumberland County liable as a joint employer for CCRD's failure to make severance payments allegedly due pursuant to 26 M.R.S.A. § 625-B. *(Id.* ¶ 44.) Accordingly, while Cumberland County has not joined CCRD's motion to dismiss, its liability under the complaint is contingent on CCRD's.

---

[3] While CCRD has paid the added health insurance costs for former CCRD full-time salaried employees, it has provided no assurance about how long and under what circumstances it will continue to pay the costs.

4

## II. Standard of Review

A motion to dismiss pursuant to M.R. Civ. P. 12(b)(6) tests the legal sufficiency of a complaint and, on such a challenge, the material allegations of the complaint must be taken as admitted. *McAfee v. Cole*, 637 A.2d 463, 465 (Me. 1994). A complaint need not identify the particular legal theories that will be relied upon, but it "must describe the essence of the claim and allege facts sufficient to demonstrate that the complaining party has been injured in a way that entitles him or her to relief." *Burns v. Architectural Doors & Windows*, 2011 ME 61, ¶ 17, 19 A.3d 823. A party may not proceed on a cause of action if that party's complaint has failed to allege facts that, if proved, would satisfy the elements of the cause of action. *Id.* "Dismissal is warranted when it appears beyond a doubt that the plaintiff is not entitled to relief under any set of facts that he might prove in support of his claim." *Johanson v. Dunnington*, 2001 ME 169, ¶ 5, 785 A.2d 1244. The court is not obliged, however, to accept the complaint's legal conclusions. *Seacoast Hangar Condo. II Ass'n v. Martel*, 2001 ME 112, ¶ 16, 775 A.2d 1166. Similarly, mere recitation of the elements of a cause of action is not sufficient to state a claim. *See Ramsey v. Baxter Title Co.*, 2012 ME 113, ¶¶ 6-7, 54 A.3d 710.

## III. Discussion

CCRD moves to dismiss the complaint arguing that the plain meaning of the Act, case law, legislative history, and subsequent legislative amendments demonstrate that plaintiffs have failed to state a claim because even though the employer changed, there is no dispute that operations at the Arena never ceased or substantially ceased.

The governing statute, 26 M.R.S.A. § 625-B provides, in pertinent part:

1. **Definitions.** As used in this section, unless the context otherwise indicates, the following words shall have the following meanings.

5

A. "Covered establishment" means any industrial or commercial facility or part thereof which employs or has employed at any time in the preceding 12-month period 100 or more persons.

...

C. "Employer" means any person who directly or indirectly owns and operates a covered establishment. For purposes of this definition, a parent corporation is considered the indirect owner and operator of any covered establishment that is directly owned and operated by its corporate subsidiary.

...

F. "Relocation" means the removal of all or substantially all of industrial or commercial operations in a covered establishment to a new location, within or without the State of Maine, 100 or more miles distant from its original location.

G. "Termination" means the substantial cessation of industrial or commercial operations in a covered establishment.

...

2. **Severance Pay.** Any employer who relocates or terminates a covered establishment shall be liable to his employees for severance pay at the rate of one week's pay for each year of employment by the employee in that establishment. The severance pay to eligible employees shall be in addition to any final wage payment to the employee and shall be paid within one regular pay period after the employee's last full day of work, notwithstanding any other provisions of law.

3. **Mitigation of severance pay liabiity.** There is no liability under this section for severance pay to an eligible employee if:

A. Relocation or temrrination of a covered establishment is necessitated by a physical calamity;

B. The employee is covered by, and has been paid under the terms of, an express contract provided for severance pay that is equal to or greater than the severance pay required by this section;

C. That employee accepts employment at the new location;

D. That employee has been employed by the employer for less than 3 years; or

E. A covered establishment files for protection under 11 United States Code, Chapter 11 unless the filing is later converted to a filing under 11 United States Code, Chapter 7.

...

10. **Mass Layoff.** Whenever an employer lays off 100 or more employees at a covered establishment, the employer within 7 days of such a layoff shall report to the director [of the bureau of labor standards] the expected duration of the layoff and whether it is of indefinite or definite duration. The director shall, from time to time, but no less frequently than every 30 days, require the employer to report such facts as the director considers relevant to a determination as to whether the layoff constitutes a termination or relocation under this section or whether there is a substantial reason to believe the affected employees will be recalled within a reasonable time.

26 M.R.S.A. § 625-B (2015), *amended by* P.L. 2016, ch. 417 §§ 1-9 (effective Mar. 29,

6

2016) (emphasis added).[4]

A. Whether Operations at the Arena Terminated Pursuant to 26 M.R.S.A. § 625-B

CCRD argues that under the plain language of the Act, only the termination of operations, not the termination of jobs or a change of employers, triggers severance pay obligations. In support, CCRD points out that "mass layoffs," by themselves, do not trigger severance payment. Furthermore, the Act's pairing of "termination" with "relocation" in the severance payment provision demonstrates operations at a covered establishment must actually cease—or substantially cease—in order for severance pay to be triggered. CCRD further contends that beyond a conclusory assertion, the Complaint does not allege any facts indicating operations at the Arena—as opposed to CCRD's run as employer—ceased or substantially ceased.

CCRD also argues that the Act's legislative history demonstrates it was passed to help employees of large, community-based businesses that closed and ceased operations— or relocated out of state—and therefore caused large numbers of people in a community to become suddenly unemployed. CCRD contends that amendments to the Act made after March 8, 2015 also highlight the fact that severance payments are triggered upon the loss of jobs by clarifying ambiguous terms governing eligible employees and using the term "closing" instead of "termination" to trigger severance payments.

Plaintiffs respond that the most reasonable interpretation of the Act is that severance pay is triggered when an employer ceases *its* operations in a covered establishment and terminates employees. Plaintiffs contend this is supported by the plain

---

[4] The subsequent amendments to the Act were not retroactive. The court therefore analyzes plaintiffs' claim under the version of the Act that was in place at the time of the events alleged in the complaint. *E.g. Norton v. C.P. Blouin, Inc.*, 511 A.2d 1056, 1060 n.5 (Me. 1986).

7

text which grammatically links the particular employer to the act of ceasing its operations. They further argue that had the Legislature intended to impose severance pay liability only when operations at a given site cease entirely—regardless of what entity is managing the operations and on what terms and conditions—it could have clearly conveyed that intention by providing, "If there is a substantial cessation of operations in a covered establishment, the last employer that operated the establishment is liable to its employees for severance pay."

In addition, plaintiffs contend that while there may be a plausible argument that operations do not substantially cease where a new employer agrees to become party to and continues to follow the collective bargaining agreement that governed the terms and conditions of the employees of the former employer, that is a rare occurrence and not what happened here. As alleged in the complaint, former CCRD employees faced the prospect of unemployment, have less secure employment, and inferior conditions of employment. The Act, plaintiffs assert, was designed precisely to avoid these negative effects on workers and the community. Plaintiffs further argue that consideration of the practical and policy consequences favor interpreting the Act to trigger severance pay when a particular employer ceases operations. This is because employers are not liable for severance pay if a particular employee has not worked for that particular employer for at least three years, resulting in the possibility that Spectra could substantially cease operations and deprive long-term employees of the covered establishment of their severance pay.

Plaintiffs also argue that the Act's legislative history indicates that its primary goal is to promote the economic welfare of Maine workers and communities when a large number of workers are simultaneously terminated from their jobs. Plaintiffs assert that CCRD's

8

unexpected termination of more than 120 employees, Spectra's failure to re-employ an unknown number, and the diminished benefits and conditions of employment with Spectra are the type of economic impacts the Act was designed to protect against. Finally, plaintiffs contend that any ambiguity must be construed to further the Act's remedial purpose of supporting Maine workers when an employer ceases its operations *and* when operations cease at the covered establishment.

The parties do not dispute that the only alleged "termination" is CCRD's cessation of *its* operations at the Arena. There are no allegations that operations at the Arena substantially ceased independent of CCRD's cessation of its operations. (*See* Compl. ¶¶27-32); *see also Nelson v. Formed Fiber Techs., Inc.*, 812 F. Supp. 2d 17, 19 (D. Me. 2011) (conclusory assertions of substantial cessation of commercial operations insufficient to state claim). Accordingly, if 26 M.R.S.A. § 625-B is not triggered by an employer's cessation of *its* operations at a covered establishment, plaintiffs have failed to state a claim and the motion to dismiss must be granted.

When interpreting a statute, the court seeks "to give effect to the intent of the Legislature by examining the plain meaning of the statutory language and considering the language in the context of the whole statutory scheme." *Darling's v. Ford Motor Co.*, 1998 ME 232, ¶ 5, 719 A.2d 111 (citations omitted). The court interprets "the plain language by taking into account the subject matter and purposes of the statute, and the consequences of a particular interpretation." *Dickau v. Vt. Mut. Ins. Co.*, 2014 ME 158, ¶ 21, 107 A.3d 621 (citation omitted). In determining a statute's practical operation and potential consequences, the Court "may reject any construction that...creates absurd, illogical, unreasonable, inconsistent, or anomalous results if an alternative interpretation avoids

9

such results." *Id.* (quotation omitted). Similarly, the Court may reject interpretations that render some language mere surplusage. *Id.* ¶ 22 (citation omitted). "Remedial statutes should be liberally construed to further the beneficent purposes for which they are enacted." *Director of Bureau of Labor Standards v. Cormier,* 527 A.2d 1297, 1300 (Me. 1987) (citation omitted).[5] No matter how liberal the courts construction, however, it must interpret the statute as it is written. *Stewart v. Maine Employment Sec. Com.,* 152 Me. 114, 120-121, 125 A.2d 83, 86 (Me. 1956).

When a statute is ambiguous, the court may look beyond the plain language of the statute and the context of the statutory scheme "to indicia of legislative intent such as the statute's history and its underlying policy." *Fuhrmann v. Staples,* 2012 ME 135, ¶ 23, 58 A.3d 1083 (quotation omitted). "A statute is ambiguous if it is reasonably susceptible to different interpretations." *Id.* (quotation omitted).

In *Shapiro Bros. Shoe Co., Inc. v. Lewiston-Auburn Shoeworkers Protective Ass'n,* the Law Court rejected due process and equal protection challenges to the constitutionality of an earlier version of the Act. 320 A.2d 247 (Me. 1974). In rejecting the due process challenge, *Shapiro Bros.* explained that:

> The obvious intent of the Legislature in passing paragraphs two and three of the statute was to ameliorate the effects on a community when a large employer voluntarily goes out of business. The required payment of severance pay when inadequate notice of the closing is given was designed to allow laid off employees to receive up to one month's pay. This would necessarily lessen the numbers of persons immediately needing welfare and other assistance from the community or State. It would also enable the affected worker to seek new employment, knowing that in the meantime he would receive at least some compensation after suddenly finding himself without work.

---

[5] A remedial statute is one intended to reform or extend existing rights or to correct defects and eliminate mischief in a pre-existing statute. BALLANTINE'S LAW DICTIONARY (3d ed. 2010).

*Id.* at 254.[6] *Shapiro Bros.* shed further light on the purpose of the Act when it concluded, "the statutory language is a reasonable exercise of the police power in seeking to combat the unemployment crisis created when a large firm voluntarily shuts down on short notice." *Id.* at 255; *see also id.* at 255, 256 ("The statute attempts, through proper notice of severance pay requirements to lessen the debilitating impact upon an area of the shutdown of a large business…. The closing of sizeable businesses will create greater unemployment and other social headaches than will the shutting down of smaller places of business whose effect may be negligible"); *see also Director of Bureau of Labor Standards v. Ft. Halifax Packing Co.*, 510 A.2d 1054, 1061 (Me. 1986) (discussing *Shapiro Bros.* and explaining the Act is "[d]esigned to protect Maine citizens from the economic dislocation that accompanies closing of large establishments"); *State v. L.V.I. Group,* 690 A.2d 960, 966 (Me. 1997) (also discussing *Shapiro Bros.* and the legislature's "stated purpose of promoting the economic welfare of individuals and communities displaced by layoffs").

More recently, in *Nelson v. Formed Fiber Techs., Inc.*, the Federal District Court of

---

[6] Paragraphs two and three of the version of the Act at issue provided:

> Whenever a person, firm or corporation employing 100 or more employees, is voluntarily going out of business, he shall give one month's prior notice to his employees and failing to give such notice shall pay severance pay of one week for each full year worked by the employee, but such severance pay shall not be more than one month's pay unless by contract the employer shall have agreed to pay a larger amount. No severance pay shall be required to be paid to any employee who has worked for less than one year for the employer and no such severance pay shall be paid if the employee is discharged for a reasonable cause. An employer subject to this section may contract with his employees to pay such employees less than the severance pay required by this section.

> If a person, firm or corporation sells his business and there is no cessation of employment in the establishment, no such severance pay shall be required. The requirements of this section shall not apply to any person, firm or corporation employing employees in seasonal employment only.

11

Maine interpreted the term "substantial cessation" when addressing whether the layoff of approximately 152 out of 300 workers constituted a "termination" under the Act. 812 F. Supp. 2d 17, 18-19. In granting the employer's motion to dismiss, *Nelson* first explained the plaintiff's allegations that the employer "relocated and/or terminated operations" and that there was a "substantial cessation of commercial operations" were "bare, conclusory assertions" that "amount to nothing more than a formulaic recitation of the elements of a claim" and, "as such, are not entitled to be assumed true." *Id.* at 19. "Standing alone, these conclusory legal assertions fail to allege a termination within the scope of the MSPA." *Id.*

The complaint also alleged, however, that the layoff of approximately 152 out of 300 workers constituted a termination under the Act. *Id.* In rejecting this argument, *Nelson* analyzed the meaning of the term "substantial cessation" by looking at dictionary definitions defining "substantial" as "material," "true," and "real;" and "cessation" as "a bringing or coming to an end" and "to stop." *Id.* at 19-21 (citing The American Heritage Dictionary of the English Language 305, 1727 (4th ed. 2000)). *Nelson* explained that the dictionary definitions indicated a termination was a "true stoppage of operations rather than a slowdown or reduction of operations." *Id.* at 20. Additionally, *Nelson* pointed out that subsection 10 of the Act provides a separate and distinct definition for the "mass layoff" of employees, which triggers its own reporting requirements. *Id. Nelson* further found the distinction between "mass layoff" and "termination" or "substantial cessation" instructive in that the Legislature chose to employ different terms thereby indicating that a mass layoff does not necessarily fall within the definition of "termination." *Id.* Accordingly, the court granted the motion to dismiss because plaintiff "pled no facts concerning a stoppage of operations at the Auburn facility." *Id.* at 22.

12

Here, considering 26 M.R.S.A. § 625-B as a coherent whole, the statute unambiguously triggers severance payments on the cessation or substantial cessation of *operations* at a covered establishment. This interpretation is supported by the statute's pairing of "relocation" and "termination," as "relocation" focuses on the loss of employment by employees, *not* changed conditions of employment or employment by a different employer. It is further supported by the mitigation of severance pay liability provision, which clarifies that severance pay is not due if an employee accepts employment at a new location. Additionally, the statute would not make sense under plaintiffs' interpretation because it would require former employers to make severance payments when a new employer takes over and offers a similar position of employment to an employee, but would not require severance payments when the original employer hired the employee for work in a new location.

Indeed, case law interpreting the Act consistently focuses on the intent to mitigate the harsh impact on employees when jobs at a particular facility are no longer available. For example, *Nelson's* discussion of cessation as a "true stoppage of operations" confirms that a substantial cessation occurs when operations are physically stopped at the employer's facility, *not* when an employer ceases its operations, but there is no stoppage of work at the facility. 812 F. Supp. 2d at 20; *see also Shapiro Bros.*, 320 A.2d at 254-55 (previous version of the Act was focused on reducing the harsh impact on individuals of losing work and requiring assistance from the community or State); *State v. L.V.I. Group*, 690 A.2d at 966 (discussing the Act and the legislature's "stated purpose of promoting the economic welfare of individuals and communities displaced by layoffs"); *Ft. Halifax Packing Co.*, 510 A.2d at 1061 (explaining that the Act is "[d]esigned to protect Maine citizens from

13

the economic dislocation that accompanies closing of large establishments"). Case law therefore provides no basis for interpreting the Act to cover situations where employees continue to work at a covered establishment, albeit under a new employer and with inferior conditions of employment.

Even if the court determined the Act was ambiguous, its legislative history demonstrates that the focus is on cessation of operations at a particular facility, not the cessation of a particular employer's operations. This is because the MSPA was initially enacted to "alleviate the adverse economic impact upon the employees and the community in which they live" from "[e]mployers of large numbers of employees who have closed their businesses without notification to their employees of the impending closedown." L.D. 424, Statement of Fact (105th Legis. 1971). Throughout the debate of the Act, proponents focused on the shock and harm caused by large employers closing large mills and putting numerous individuals out of work without notice. Legis. Rec. 3551 (House Testimony), 3864 (Senate Testimony) (1971).[7] This harm is distinct from the harm alleged in plaintiffs' complaint, namely the harm caused by a change in employers and the imposition of inferior working conditions.

Finally, while the court recognizes that its interpretation could result in employees losing their entitlement to severance payments when a new employer takes over—which could become especially problematic if the new employer closes the business within three years after taking over—it is not the court's function to rewrite the plain language of

---

[7] The Act was amended in 1980 to something more closely approaching the iteration at issue in the present case with the explanation that it "repeals and reallocates section to correct style." L.D. 1703, Statement of Fact, §§ 143-44 (109th Legis. 1980). Implicit in this amendment is the conclusion that the essential purpose of the statute was not altered.

14

legislation. *See Director of Bureau of Labor Standards v. Diamond Brands, Inc.*, 588 A.2d 734, 736-37 (Me. 1991) (refusing to consider a "successor corporation" as an "indirect" owner and operator under the Act because it would "impose an unusual and strained meaning" on the Act's plain language and, in any event, the legislative history showed a deliberate return to a narrower class of defendants liable for severance pay). Similarly, although the court liberally construes the Act as a remedial statute, the court's interpretation is guided by the statute's plain language as it is written.

Accordingly, the court grants CCRD's motion to dismiss plaintiffs' complaint because the severance pay provision in 26 M.R.S.A. § 625-B is not triggered by an employer's cessation of *its* operations at a covered establishment.

## IV. Conclusion

For the reasons discussed above, the court grants CCRD's motion to dismiss plaintiffs' complaint against both defendants.

The clerk is directed to incorporate this Order into the docket by reference pursuant to Maine Rule of Civil Procedure 79(a).

Dated: July 7 , 2017

John O'Neil, Jr.
Justice, Superior Court

ENTERED ON THE DOCKET ON: 7/7/17

15